IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02418-MEH

VICTOR CEJKA,
JAMES WALKER,
STEVEN WASCHER,
JAMIE LYTLE, and
PAUL CROSS,

        Plaintiffs,

v.

VECTRUS SYSTEMS COMPORATION, f/k/a Exelis Systems Corporation,
BRANDON SPANN, and
KEVIN DANIEL,

        Defendants.

---

## ORDER ON MOTIONS TO DISMISS

---

**Michael E. Hegarty, United States Magistrate Judge**.

        Before the Court are Defendant Vectrus Systems Corporation's Motion for Partial Dismissal [filed December 15, 2015; docket #6] and Defendants Spann's and Daniel's Amended Motion for Dismissal Pursuant to Rule[s] 12(b)(1), 12(b)(2), and 12(b)(6) [filed January 25, 2016; docket #22]. This matters are fully briefed, and the Court finds that oral argument (not requested by the parties) would not materially assist the Court in adjudicating the motions. For the following reasons, Spann's and Daniel's motion is granted pursuant to Fed. R. Civ. P. 12(b)(2) and Vectrus' motion is granted in part and denied in part as set forth herein.[1]

## BACKGROUND

        Plaintiffs initiated this employment action against Defendants on October 30, 2015.

---

[1]On December 31, 2015, the parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and D.C. Colo. LCivR 40.1.

Essentially, they allege claims against Defendant Vectrus Systems Corp. ("Vectrus") for common law retaliatory termination (Claim I) and for violation of 10 U.S.C. § 2409, the Department of Defense whistleblower statute (Claim II); a claim against all Defendants for common law outrageous conduct (Claim III); and a claim against the individual Defendants, Brandon Spann ("Spann") and Kevin Daniel ("Daniel") for intentional interference with contract and/or prospective business advantage (Claim IV).

## I.      Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiffs in the operative Complaint and pertinent to the present motion, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Vectrus is a federal contractor that has numerous contracts and subcontracts with various departments of the federal government throughout the United States and abroad.  Vectrus entered into a subcontract with Fluor Corporation ("Fluor") to provide certain services to the Department of Defense at BAF, which is a U.S. military base inside a combat zone, and at other U.S. military bases in Afghanistan. Vectrus' subcontract was subsequently amended or modified (hereinafter referred as the "Contract").  Fluor has the prime contract with the Department of Defense.

Plaintiffs were employed by Vectrus as security investigators in its Personnel Services Department at BAF.  Cross was the lead security investigator.  Plaintiff Victor Cejka ("Cejka") was assigned by Vectrus to the Contract, specifically its Logistics Civilian Augmentation Program (LOGCAP) IV Project Task Order 005 in Afghanistan (the "Program"), from August 13, 2012 to December 12, 2013.  Plaintiff James Walker ("Walker") was assigned by Vectrus to the Program from January 7, 2013 to July 12, 2014.  Plaintiff Steven Wascher ("Wascher") was assigned by

Vectrus to the Program from January 2013 to June 2014.   Plaintiff Jamie Lytle ("Lytle") was assigned by Vectrus to the Program from August 13, 2012 to December 12, 2013.  Plaintiff Paul Cross ("Cross") was assigned by Vectrus to the Program from June of 2010 to September 13, 2013.

In the summer and fall of 2013, Plaintiffs worked together in the Vectrus Personnel Services Department at BAF as part of the Program.  The Personnel Services security investigators at BAF, including Plaintiffs, were responsible for conducting interviews and investigations required for the issuance of badges and for maintaining the investigation information in the Biometric Automated Toolset ("BAT") computer database. The U.S. government maintains the BAT database in conjunction with its European allies. The biometric tracking and identification information that is maintained in the BAT system includes fingerprints, iris scans and facial photos. The BAT system is critical to the U.S. Military's efforts to combat insurgent forces in Afghanistan that are interspersed within an indigenous population. The maintenance of accurate information in the BAT system is vital to the security of BAF and the U.S. Military's other bases in Afghanistan.

According to the Fluor Desktop Guidelines, the duties of investigators are as follows:

> Investigator. Conducts initial, bi-annual, and exit or directed interviews of host and foreign nationals who apply for or leave employment on US military installation; supervises Identification Card Office; enters data into biometric HUMINT screening database; collects biometrics and conduct enrollments; other duties as assigned/required within the FPSC operational realm; accurately complete the work and records associated with their work assignments as specified by this DTG and submit them to the Personnel Services Supervisor on a regular basis for review and approval.

The security investigators also are required to report to their supervisors and the military any possible criminal conduct or other threats to the safety or security of the base or personnel.

In the summer 2013, the Vectrus Personnel Services Department at BAF ("FPSC") was supervised by Cross in his capacity as lead investigator, who reported to Vectrus' Senior Security Supervisor, Defendant Brandon Spann ("Spann"), who in turn reported to Vectrus' Regional

Security Manager, Defendant Kevin Daniel ("Daniel"), who ultimately reported to Vectrus' Country Manager Richard Diaz ("Diaz"). The military oversight person for FPSC was Sergeant First Class John Salinas ("SFC Salinas").

Starting in August 2013, Plaintiffs observed Spann and other Vectrus employees engaging in what they perceived to be security violations and other wrongful behavior. Plaintiffs contemporaneously prepared a day-by-day timeline which described in detail the activities they discovered and actions they took to report the wrongdoing and to assist the U.S. Military's investigation of the alleged wrongdoing by Vectrus employees. For example, Plaintiffs discovered that Spann permitted an unauthorized person who did not have security clearance, a Fluor employee named James Brown ("Brown"), to participate in interviews, screenings, and interrogations of Host Country Nationals and Third Country Nationals. Cross reported this information to Daniel, and Cross and Wascher also reported it to military oversight, SFC Salinas.

Plaintiffs also discovered that an investigation report on BAT prepared by Wascher had been altered to remove the information that had been provided by Daniel pertaining to a sexual relationship one of his friends was having with the target of the investigation, as well as other information that implicated members of Vectrus management or their friends. Wascher reported this incident to the lead investigator, Cross, who reported it to Spann and Daniel, and instructed Wascher to resubmit a complete report. However, Spann reprimanded Cross and ordered him and the other investigators to stop any discussions of deletions or alterations on BAT.

Plaintiffs did some further review and learned that other investigation reports had been either deleted from BAT or altered. They reported this information to Spann but no action was taken. Plaintiffs also reported it to military oversight, SFC Salinas. Plaintiffs understood that tampering with investigation reports was a very serious violation because it compromised the integrity of the

BAT system, which threatened the security at BAF and the other U.S. military bases in Afghanistan.

In early September 2013, Salinas initiated a military investigation and Wascher provided a statement at the military's request.  Shortly thereafter, Wascher was asked to investigate unauthorized identification cards in the possession of Turkish workers and the lack of the required documentation in their BAT dossiers.  Spann confronted Wascher and attempted to convince him to drop that investigation.  Spann had a close relationship with two Turkish contractors and was allegedly having a sexual relationship with the daughter of the owner of one of the contractors.  Plaintiffs believe Spann's efforts were intended to protect members of Vectrus management and possibly the Turkish contractor, since it was their understanding that Spann had previously attempted to protect the Turkish contractor by improperly directing investigators to back off of an investigation into human trafficking allegations involving the use of young Turkish male sex slaves by said contractor on the base and by giving the contractor advance notice of raids by the military.

Shortly after he confronted Wascher, Spann told Plaintiffs that he had persuaded the military head of BAF, known as "Garrison Command," to replace SFC Salinas as military oversight for FPSC.  Thereafter, SFC Salinas was replaced by James Fox.  Spann directed Plaintiffs not to provide statements or assist in the military's investigation without approval of Vectrus's HR department.  However, Plaintiffs continued to cooperate with the military's investigation.  On September 20, 2013, Salinas met with Plaintiffs and advised them that the military was continuing to investigate the information they had provided.

On September 24, 2013, Spann announced that Vectrus had terminated Cross for purportedly violating Vectrus' rules of conduct by disclosing classified information and making a false statement during an investigation.  Plaintiffs believe that, because Cross was the lead investigator, Spann and others at Vectrus hoped his termination would send a message to the other investigators and stop

them from any further cooperation with the military's investigation.

During this time period – September to October 2013 – other Vectrus employees began bringing what they perceived to be wrongful conduct to Plaintiffs' attention, and Plaintiffs observed other alleged illegal activities by Vectrus managers.  For example, one employee described to Plaintiffs certain activities of Spann, Daniel, Carl Lynch ("Lynch"), and another investigator, Gary Blanchard ("Blanchard"), including control of drugs, alcohol and prostitutes on base, and transferring or terminating uncooperative employees who would not go along with their activities. The employee

also showed Plaintiffs text messages allegedly indicating unauthorized activity with classified information.

Plaintiffs also observed that two security investigators, Marc Salazar ("Salazar") and Robert Redd ("Redd"), who were close friends of Spann and Daniel, were conducting alleged improper and harassing/abusive interviews, improperly cherry-picking files to investigate, using only certain interpreters, and creating inaccurate and incomplete investigation reports.  Plaintiffs reported this information to Vectrus's HR department, which took no steps to stop these activities.

Plaintiffs also provided information concerning these activities to military oversight (Fox) and SFC Salinas.  At the military's request, Plaintiffs gave interviews to the Criminal Investigation Division ("CID"), U.S. Army Counter-Intelligence Unit ("CI"), the Air Force Office of Special Investigations ("OSI"), and the Judge Advocates General's Office ("JAG").

Plaintiffs discovered alleged improprieties with respect to investigation reports prepared by Salazar including inadequate reports to support issuance of badges (including that over 100 BAF badges had been printed without necessary investigations or paperwork), portions of reports deleted from BAT, and alerts being put on dossiers by Salazar using the name of Sergeant Justine Shahan

(Military Oversight Non-Commissioned Officer in Charge) without her knowledge. They reported these activities to Thomas Robin ("Robin"), Security Supervisor for Vectrus, but no action was taken.

Throughout this time period, Plaintiffs met frequently with SFC Salinas at his request to update him with further information on these reported activities as it became available.  On October 18, 2013, Plaintiffs attended a meeting at BAF Brigade Headquarters with SFC Salinas, Andrew Albright (a GS15 civilian counterpart to the Commander of the Garrison), and Command Sergeant Major Paul Bianco.  Plaintiffs gave statements and discussed the seriousness of the reported conduct, including particularly the perceived threat to the integrity of the BAT system.  Albright told Plaintiffs that CI was not moving on the information and, therefore, the military had decided to call in the FBI and NSA to investigate.  Plaintiffs were ordered to continue reporting to SFC Salinas as their point of contact and to keep the matters discussed in the military's investigation confidential.

Plaintiffs observed further conduct by Vectrus management employees, including observing an uncleared person given access to the FPSC database room, an uncleared person (the daughter of the owner of a Turkish construction company) given access to Spann and Daniels' supervisor's administrative office, unauthorized Fluor employees sitting in on investigations, Spann accessing the military oversight office during restricted hours without authorization, Spann and Fox allegedly coaching a person on how to lie about an incident under investigation, and the perceived cover up of a harassment investigation that involved the severe (near death) beating of the complaining female. During this time period, Plaintiffs gave several interviews to CI and CID regarding the various incidents as requested and continued to provide updates to SFC Salinas.

On October 20, 2013, Plaintiffs were told that Fox was leaking information (including their initial statements given to OSI) to Spann and Daniel.  Plaintiffs and the other security investigators

had been repeatedly threatened and admonished by Spann, Daniel, Salazar, and Redd not to cooperate with SFC Salinas's investigation and to only go through the Vectrus company chain of command.

On October 29, 2013, Wascher was transferred to Forward Operating Base ("FOB") Marmol. Daniel and two others met Wascher at the airport gate – Daniels stated he was "there to make sure Wascher got on his flight." At the end of October 2013, Walker was transferred to FOB Shank. Daniel had Robin call him when the aircraft carrying Walker took off from BAF, and again when it landed at FOB Shank to confirm that Walker was gone from BAF. These FOBs are much more dangerous than BAF in that they took incoming rockets on a daily basis. Plaintiffs believe Spann and Daniel ordered these transfers hoping Wascher and Walker would resign rather than accept the transfers; and knowing Wascher and Walker would lose their seniority and that, even if they did not resign, their positions would be eliminated in the next draw-down, despite the fact that their BAF seniority would have protected them but for the transfers.

At 2:00 a.m. on November 5, 2013, the military conducted a base-wide raid at BAF and apprehended eight Vectrus employees: Daniel, Spann, Lynch, Salazar, Redd, Artan Fana, Agron Fana, and Shajaida Rivera. These eight individuals were removed from the Contract and from Afghanistan, and their security clearances were revoked. Plaintiffs have learned that these eight Vectrus employees were released in Dubai the next day. Plaintiffs are unaware whether their employment was terminated by Vectrus.

Multiple other Vectrus employees assigned to BAF have been terminated or resigned in conjunction with the military's investigation following the Plaintiffs' whistleblowing activity. Brown, a Fluor Country Security Officer, also was removed from the Contract and from Afghanistan, and had his security clearance revoked by the military. In addition, Fox was removed

from his position as the FPSC military oversight and SFC Salinas was reinstated to that position. On information and belief, at least 20 Vectrus employees and others were removed from the Contract and BAF, and had their security clearances revoked.

Plaintiffs continued to relay additional information they learned to the military investigators, including that Wascher received a complaint regarding a prostitution ring, the possession of electronic devices, and other conduct implicating Salazar and Blanchard.   In addition, two supervisors were observed discussing their effort to gather laptop computers to keep them from the military investigation.   Plaintiffs also learned that FPSC personnel had been given advance warning of the military raid and told to hide anything incriminating.   Finally, an interpreter advised of an investigation concerning selling documents and coaching local nationals on how to answer questions in interviews.

Plaintiffs believe Vectrus management identified them as the whistleblowers – management pressured Plaintiffs to provide the dossiers on all of the Vectrus employees that had been implicated for alleged illegal activities and other information that had been provided to the military, and directed Plaintiffs not to cooperate with the military investigation but, rather, to proceed only through Vectrus HR or company chain of command.

On November 21, 2013, Plaintiffs learned that Vectrus made a complaint against Cross' security clearance accusing him of a security violation without notifying the Government as required, which Plaintiffs believe was designed to invalidate Cross' security clearance and prevent him from being able to find employment in another position requiring a security clearance.

In November and December 2013, Plaintiffs cooperated with interviews by Vectrus Ombudsman (Bridget Bailey) and Employee Relations (Donald Askew); however, they had been ordered by the military not to disclose the information that was the subject of the military's ongoing

investigation.  On November 24, 2013, Nadine Guilbeaux, the Vectrus HR representative who had been conducting interviews, was terminated allegedly for having sexual relationships with Spann. Plaintiffs believed that Ms. Guilbeaux had been leaking information from their interviews back to Spann.

Diaz, who as Vectrus' Country Manager, was the highest ranking Vectrus employee in Afghanistan, spearheaded Vectrus' internal investigation in November and December 2013 into the activities the Plaintiffs had revealed. However, this internal investigation was not designed to discover and take action against the wrongdoers.  Instead, Plaintiffs believe that Diaz – with the assistance of Bridget Bailey and Donald Askew, among others – used the investigation to orchestrate a cover-up specifically intended to cause injury to the Plaintiffs still at BAF because of their whistleblowing and cooperation with the military's investigation of the wrongful conduct.

On November 29, 2013, Cejka and Lytle received Certificates of Achievement from the military "for outstanding performance, dedication and support for the mission."  When presenting the awards, the military spokesman stated that Cejka and Lytle were the top two investigators country wide in terms of the high quality of their investigations and high production. The Certificates state:

> For outstanding performance and continued dedication and support of the Garrison mission at Bagram Airfield. Your tireless efforts and dedication at ECP 1 screening are instrumental in providing an elevated quality of life to the Soldiers, Sailors, Airmen, Marines and civilian personnel assigned to Bagram. We thank you for your untiring support of American troops and civilians serving in harms way.

Cejka and Lytle were terminated by Vectrus on December 12, 2013, less than two weeks after receiving the Certificates of Achievement from the military, for allegedly violating Vectrus' rules of conduct by making a hand gesture toward another investigator on a single occasion.  The complaining employee was Redd, a close friend of Spann, who was removed by the military from

the Contract and Afghanistan during the November 5 raid.

On February 7, 2014, Cejka, Walker, Wascher and Lytle received a letter from Andrew Albright, Garrison Command Security Manager at BAF, confirming that they were cooperating individuals in a federal security investigation during the period July 2013 through January 2014 involving their employer at BAF. The letter describes the investigation and the importance of the integrity of the BAT system and states:

> Many of the cooperating individuals that assisted Federal Security and Intelligence investigators were reassigned to remote outstations, or terminated by their employer for minor infractions. Unfortunately, the Whistle Blower Protection Act is a slow and cumbersome process.

Following the November 5, 2013 raid, the Bagram FPSC was severely understaffed of security investigators allegedly as the result of the raid and transfers of Wascher and Walker. The remaining investigators at BAF were conducting two to three times the number of interviews recommended in a given day (the recommended level is 10 interviews per day).  Vectrus management openly discussed the need to transfer additional security investigators to BAF to assist with the severe overload; however, they stated on numerous occasions that they would not consider transferring Wascher or Walker from the FOBs back to BAF, even though Walker and Wascher were the two most experienced investigators and had expressed a willingness to return.

In June 2014, Vectrus informed Wascher his position was being eliminated in a "draw-down."  Wascher's seniority should have protected him from the draw-down. After the draw-down, despite having open security investigator positions and being severely understaffed at BAF, Vectrus offered Wascher only a lower position as a Biometric Processing Clerk at substantially less pay. Wascher declined to accept the demotion.

On July 12, 2014, Vectrus informed Walker his position was being eliminated in a "draw-down."  Walker's seniority should have protected him from the draw-down. After the

draw-down, despite having open security investigator positions and being severely understaffed at BAF, Vectrus offered Walker only a lower position as a Biometric Processing Clerk at substantially less pay. Walker declined to accept the demotion.

## II. Procedural History

In response to Plaintiffs' Complaint, Vectrus filed the present motion for partial dismissal, arguing that Plaintiffs' first and third state law claims are preempted by the Defense Base Act, 42 U.S.C. § 1651 *et seq.* ("DBA"), but, even if it not, Colorado law does not apply to Plaintiffs' employment in Afgantstan. Alternatively, Vectrus argues that Plaintiffs' third claim for outrageous conduct fails to state a claim for relief.

Plaintiffs counter that Vectrus should be barred by collateral estoppel from raising its defenses, since two courts in this District have already rejected such defenses. In addition, Plaintiffs contend the DBA applies only to claims for injury or death, not to claims for wrongful discharge or outrageous conduct. Plaintiffs also assert that Colorado law applies to Vectrus, a Colorado employer. Finally, Plaintiffs argue their first and third claims are separate and distinct and, thus, the claim for outrageous conduct is actionable.

Vectrus replies arguing that there is no substantial relationship between Colorado and the wrongs alleged by Plaintiffs and, thus, the state claims should be dismissed. It also contends the DBA governs any "injury" claimed by the Plaintiffs; a forum selection clause is not a "choice of law" provision and does not provide Plaintiffs access to Colorado law; and the alleged facts do not support a claim for outrageous conduct.

In addition, Defendants Spann and Daniel filed an amended motion for dismissal arguing the Court lacks personal jurisdiction over them;[2] the DBA bars the Plaintiffs' claims; Colorado common

---

[2]Although Defendants also bring their motions pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, the Court does not perceive a basis for application of Rule 12(b)(1).

law has no application to Plaintiffs' claims; and, Plaintiffs' claims of outrageous conduct and intentional interference fail to state claims for relief. Plaintiffs counter with the same arguments as those raised against Vectrus, and, in addition, assert specific (as opposed to general) personal jurisdiction over Spann and Daniel. Spann and Daniel reply arguing Plaintiffs fail to demonstrate they "purposefully directed their activities" at Colorado sufficient to establish personal jurisdiction.

## LEGAL STANDARDS

### I.   Dismissal under Fed. R. Civ. P. 12(b)(2)

"Where a district court considers a pre-trial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *AST Sports Science, Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056-57 (10th Cir. 2008) (citing *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Id.* at 1057 (quoting *OMI Holdings, Inc. v. Royal Ins. Co.*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

> The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation

---

To the extent the Defendants argue the Court lacks subject matter jurisdiction due to the DBA's alleged preemption of Plaintiffs' claims:

> the applicability of the DBA's exclusivity provision ... presents an issue of preemption, not jurisdiction. Federal preemption is an affirmative defense that a defendant must plead and prove. Unless the complaint itself establishes the applicability of a federal-preemption defense – in which case the issue may properly be the subject of a Rule 12(b)(6) motion – a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

*Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012). Accordingly, the Court will analyze the Defendants' preemption arguments pursuant to Fed. R. Civ. P. 12(b)(6).

by the moving party. However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true.

*Wenz*, 55 F.3d at 1505 (citations and internal quotation marks omitted). "[T]o defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating that the presence of some other considerations would render jurisdiction unreasonable." *OMI Holdings, Inc.*, 149 F.3d at 1091 (citation and internal quotations omitted).

"Jurisdiction to resolve cases on the merits requires ... authority over the parties (personal jurisdiction), so that the court's decision will bind them." *Gadlin v. Sybron Int'l Corp.*, 222 F.3d 797, 799 (10th Cir. 2000) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)). In a federal question case, the federal court must determine "(1) 'whether the applicable statute potentially confers jurisdiction' by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process.'" *Peay v. Bellsouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (citation omitted). However, as there is no federal statute authorizing nationwide personal jurisdiction at issue here, Fed. R. Civ. P. 4(k)(1)(A) refers to the Colorado long-arm statute. In Colorado, only one inquiry is necessary, as the Colorado long-arm statute, Colo. Rev. Stat. § 13-1-124(1), "confer[s] the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions," and its requirements are necessarily addressed under a due process analysis. *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005) (en banc).

## II. Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.  Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

### I.  Does the Court Have Personal Jurisdiction Over Spann and Daniel?

When evaluating personal jurisdiction under the due process clause, the Tenth Circuit conducts a two-step analysis. At the first step, the court examines "whether the non-resident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'" *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd.,* 488 F.3d 1282, 1287 (10th Cir. 2007) (citations omitted). If the defendant has sufficient contacts, the court then asks whether "exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice,'" that is, whether the exercise of jurisdiction is "reasonable" under the circumstances of a given case. *Id.* (citations omitted). "This analysis is fact specific." *ClearOne Commc'ns., Inc. v. Bowers*, 643 F.3d 735, 763 (10th Cir. 2011) (quoting *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010)).

The "minimum contacts" test may be met pursuant to either of two ways – general jurisdiction or specific jurisdiction. First, if a defendant has "continuous and systematic general business contacts" with the forum state, it may be subjected to the general jurisdiction of the forum state's courts. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). Second, even in the absence of "continuous and systematic" contacts, a state's courts may exercise specific jurisdiction over a defendant that "purposefully directed" its activities at the state's residents, if the cause of action arises out of those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985); *see also Benton v. Cameco Corp.*, 375 F.3d 1070, 1076 (10th Cir. 2004) ("A defendant's contacts are sufficient if the defendant purposefully directed its activities at residents of the forum,

and the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state.") (internal quotation marks and citation omitted).

In addition to examining the defendant's minimum contacts with Colorado, the Court must analyze whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice" in this case. *ClearOne Commc'ns., Inc.*, 643 F.3d at 764. This inquiry requires a determination of whether personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case. *Id.* In assessing reasonableness, a court considers: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.*

A.    Minimum Contacts

Here, the Plaintiffs assert this Court's specific (as opposed to general) personal jurisdiction over Spann and Daniel.

"Under the specific-jurisdiction requirement, a plaintiff satisfies the minimum-contacts standard by showing that (1) the defendant has purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state, and (2) the litigation results from the alleged injuries that arise out of or relate to those activities." *Bartile Roofs, Inc.*, 618 F.3d at 1160. "Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, -- U.S. -- , 131 S.Ct. 2846, 2851 (2011).

In *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102 (1987), the Supreme Court analyzed whether a tire valve manufacturer's intentional act of placing its assemblies into the

17

stream of commerce by selling them to tire manufacturers, coupled with its awareness that some of the assemblies would eventually reach the forum state, were sufficient to support personal jurisdiction.  The Court concluded:

> The "substantial connection" between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.  The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. *Additional conduct of the defendant* may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112 (emphasis added).

The Supreme Court recently re-articulated the criteria for establishing specific jurisdiction. *See  Walden v. Fiore*, -- U.S. --, 134 S. Ct. 1115 (2014). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Id.* at 1121 (quoting *Keeton*, 465 U.S. at 775).  The "defendant's suit-related conduct must create a substantial connection with the forum state" and "the relationship must arise out of contacts that the defendant *himself* creates with the forum State"... with the "minimum contacts analysis look[ing] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 1121-22 (citing *Burger King*, 471 U.S. at 475 and *Int'l Shoe Co. v. State of Wa.*, 326 U.S. 310, 319 (1945)) (emphasis in original).  The "plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connections with the forum State" to support the basis for specific jurisdiction. *Id.* at 1122-23 (citing *Burger King*, 471 U.S. at 478).

In support of their argument that personal jurisdiction exists, Plaintiffs point to the following allegations: (1) Spann and Daniel were employed by Vectrus, a Colorado-based business, (2) Spann and Daniel were directly part of a scheme to retaliate against Plaintiffs for exposing alleged wrongdoing, and (3) Spann and Daniel communicated with human resources personnel in Colorado concerning decisions to allegedly retaliate against, attempts to intimidate and, ultimately, the terminations of, the Plaintiffs.  Plaintiffs cite the Tenth Circuit's opinion in *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) for support of their position.  In *Dudnikov*, the plaintiffs sought a judicial declaration that their fabrics did not infringe the defendant's copyrights, and the defendants responded with a motion to dismiss for lack of personal jurisdiction. *Id.* at 1068.  However, in that case, the plaintiffs specifically relied on the Supreme Court's opinion in *Calder v. Jones*, 465 U.S. 783 (1984) for support of their argument in favor of personal jurisdiction.  In *Calder*, the Court concluded that the defendant's "intentional, and allegedly tortious, actions were expressly aimed at California."  *Id.* at 789.  Accordingly, the *Dudnikov* court interpreted *Calder* to provide a means of demonstrating purposeful direction (also known as "purposeful availment") through "(a) an intentional action ... that was (b) expressly aimed at the forum state ... with (c) knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov*, 514 F.3d at 1072.  Although it appears the case was not a tort action and sought only declaratory relief, the *Dudnikov* court accepted the plaintiffs' allegation that the defendant acted to halt an eBay auction of the plaintiffs' fabrics as sufficient to meet element (a).  *Id.*

Here, the Court agrees with Plaintiffs that their allegations likely meet element (a) of *Dudnikov*'s purposeful availment analysis.  It is less clear that the allegations meet element (b). First, the allegations mention nothing about Spann and Daniel having contact with Colorado personnel and the Plaintiffs provide no affidavits attesting to the same; in fact, although there are

19

references to Vectrus' "HR department" in the Complaint, the Plaintiffs allege that an HR representative "was terminated for having sexual relationships with Spann" and they "believed [she] was leaking information from their interviews back to Spann." Complaint, ¶ 76, docket #1. Such allegation implies that an "HR department" was located at the base in Afghanistan. And, second, even if Spann and Daniel communicated with human resources in Colorado, simply because decisionmakers were located in Colorado is not sufficient to demonstrate specific jurisdiction. *See Walden*, -- U.S. --, 134 S. Ct. at 1121-22.

Finally, regarding element (c), there is no indication from the allegations that Spann and Daniel, while allegedly communicating with HR personnel in Colorado, did so "with knowledge that the brunt of the injury would be felt in" Colorado. *Dudnikov*, 514 F.3d at 1072. In other words, Plaintiffs' allegations fail to demonstrate that Spann's and Daniel's conduct created a relationship among them, Colorado, and the litigation. *Walden*, 134 S. Ct. at 1121. Certainly, the HR officials with whom Spann and Daniel communicated could have been located anywhere; there is nothing in the allegations indicating that Vectrus' HR location made any difference in how the Plaintiffs were injured. Most importantly, none of the Plaintiffs, who have allegedly suffered injuries in this action, reside in Colorado and there is nothing in their allegations indicating that the "brunt" of their injuries was "felt" in Colorado.

B.     Fair Play and Substantial Justice

Because the Court has determined there are insufficient minimum contacts to establish personal jurisdiction, the Court need not engage in an analysis to determine whether the imposition of personal jurisdiction is reasonable.

In light of *Walden* and *Dudnikov*, the Court must conclude that Plaintiffs have failed to demonstrate this Court has specific personal jurisdiction over Defendants Spann and Daniel. In their

response brief, Plaintiffs assert that the Court should grant their (then pending) motion seeking leave to conduct limited jurisdictional discovery;[3] however, at a subsequent hearing before this Court, counsel for the parties agreed that the motions could be adjudicated only on the papers, but Plaintiffs requested that any order of dismissal for lack of personal jurisdiction be without prejudice. Accordingly, the Court denied Plaintiffs' motion for limited discovery without prejudice. *See* February 2, 2016 Conference Minutes, docket #28.

The Tenth Circuit has stated that "a court may *sua sponte* cure jurisdictional and venue defects by transferring a suit under the federal transfer statutes, 28 U.S.C. §§ 1406(a) and 1631, when it is in the interests of justice." *Trujillo v. Williams*, 465 F.3d 1210, 1222 (10th Cir. 2006). The court interpreted those statutes to grant the district court discretion in making a decision to transfer an action or, instead, to dismiss the action without prejudice. *Id.* Here, neither party has requested transfer and there is no indication in the record as to a proper location to which the Court might transfer Plaintiffs' claims against Spann and Daniel.

Accordingly, the Court will grant the motion to dismiss Defendants Spann and Daniel for this Court's lack of personal jurisdiction and dismiss Plaintiffs' claims against them without prejudice.

## II.    Are Vectrus' Defenses Barred by Collateral Estoppel?

Plaintiffs argue that Vectrus is estopped from asserting that their claims are preempted by the DBA and that Colorado law does not apply to the claims, because Vectrus or its predecessors litigated these issues in two prior cases before courts in this District.   Vectrus counters that preclusion of their defenses is improper here where the Plaintiffs fail to show (1) the previous

---

[3]Plaintiffs contend that discovery could reveal Spann's and Daniel's reasonable expectations of being haled into Colorado to defend their employment-related conduct in light of their employment contracts, which might contain forum selection clauses requiring them to bring claims in federal or state courts in Colorado.

defenses were identical with those presented here and (2) the prior cases were finally adjudicated on the merits.

"Federal law governs the scope of the preclusive effect given to federal-court decisions." *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 500 (2001)).

> For an issue to be collaterally estopped, the party invoking the doctrine has the burden of establishing four separate elements:
>
> (1) the issue previously decided is identical with the one presented in the action in question,
>
> (2) the prior action has been finally adjudicated on the merits,
>
> (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and
>
> (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Id.* (citing *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992); *Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009)). "As long as the issues are identical, 'issue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim.'" *Id.* (citing *Park Lake Res. LLC v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004)).

Collateral estoppel (or, "issue preclusion") may be applied even though the party asserting it was not a party in the prior action. *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)). "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Matosantos Commercial Corp. v. Applebee's*

*Int'l, Inc.*, 245 F.3d 1203, 1208 (10th Cir. 2001) (quoting *Allen*, 449 U.S. at 94).

Here, there is no dispute for purposes of this motion as to the third element necessary to show collateral estoppel. *See* Reply, docket #33 at 7 n.5. But, Vectrus cites the Tenth Circuit's opinion in *C & M Props., L.L.C. v. Burbidge (In re C & M Props., L.L.C.)*, 563 F.3d 1156 (10th Cir. 2009) for the proposition that "issue preclusion does not attach where the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action." Reply, docket #33 at 5 (internal quotations and brackets omitted). Vectrus, then, cites cases holding that denials of motions to dismiss and motions for summary judgment are not "appealable" and, therefore, cannot serve as final judgments for issue preclusion. "The appealability of a judgment, however, does not hinder its preclusive effect." *Mactec, Inc. v. Gorelick*, 427 F.3d 821, 832 (10th Cir. 2005) (citing 18A Wright & Miller, supra, § 4433, at 78-85 (noting general rule that a final judgment from a lower court carries res judicata effect even though it is still subject to review by an appellate court)). In other words, the question here is not whether the judgments in the previous actions were "appealable" at the time they were rendered, but whether the judgments *could be* reviewed in that action. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 647-48 (2006) (in a securities case challenging whether a remand order was appealable, the Court held that the parties were not estopped from bringing issues raised in federal court before the state court since the state court could reject the district court's reasoning and "any claim of error on that point can be considered on review by this Court."). Certainly, no one disputes that denials of motions brought pursuant to Fed. R. Civ. P. 12(b)(6) or 56 *can be* reviewed if the action proceeds to appeal.

Nevertheless, Vectrus argues that the previous actions reached no "final judgment" because they were voluntarily dismissed and, "[a]lthough a voluntary dismissal with prejudice can acts as a final adjudication on the merits against a plaintiff who voluntarily dismisses, there is no law

23

suggesting that a voluntary dismissal of claims is a final adjudication on the merits against a defendant." Reply, docket #33 at 4. The Court disagrees.

In *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1128 n.19 (10th Cir. 2010), the court denied a defendant's request to uphold the trial court's order approving a stipulation and dismissing the claims with prejudice upon the parties' joint motion, because the order was a "judgment on the merits" and the trial court had no jurisdiction to issue such an order. *Id.* (citing *Brooks v. Barbour Energy Corp.*, 804 F.2d 1144, 1146 (10th Cir. 1986) ("[The dismissal] was a voluntary dismissal with prejudice upon an order of the court, based on the settlement agreement. This dismissal should be considered a judgment on the merits because it was entered pursuant to a settlement that resolved the substance of the disputed claims. Such a dismissal by stipulation and approved by the court with prejudice is *res judicata*-barring a later lawsuit on the same transaction or occurrence.")).[4] Accordingly, the Court rejects Vectrus' argument that the previous actions, dismissed by stipulation of the parties, were not "adjudicated on the merits" for purposes of issue preclusion.

However, Vectrus argues that the issues raised in the previous actions were not "essential to the judgment," as required for issue preclusion. That is, "issue preclusion will not apply in the absence of a valid and final judgment to which resolution of a particular issue was necessary." *Stan Lee Media, Inc.*, 774 F.3d at 1297 (citing *C & M Props., LLC*, 563 F.3d at 1166). The Tenth Circuit cites this proposition in the context of its consideration of the fourth element necessary to show issue preclusion (i.e., whether the party had a full and fair opportunity to litigate the issue). *Id.*

---

[4]*See also Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 534 (4th Cir. 1991), in which the court cited Fed. R. Civ. P. 41(a)(2) and found "a voluntary dismissal with prejudice ... is a complete adjudication on the merits of the dismissed claims." In that case, the plaintiff and an individual defendant agreed to dismiss their claims with prejudice; accordingly, the court determined that the defendant "has been adjudicated not liable for [the claims plaintiff brought against him]."

Specifically, Vectrus contends, "Neither the application of Colorado common law claims to employment of non-Colorado individuals employed overseas nor DBA preemption of common law employment claims were essential to the voluntary joint dismissal of the cases." Reply, docket #33 at 7. To the extent the term "final judgment" always refers to the actual resolution of the action, Vectrus would be correct in this case where the actions were resolved by stipulation of the parties. The Supreme Court in *Arizona v. California*, 530 U.S. 392, 414 (2000) found:

> But settlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect. "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments ordinarily support claim preclusion but not issue preclusion." 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4443, pp. 384-385 (1981). This differentiation is grounded in basic res judicata doctrine. It is the general rule that issue preclusion attaches only "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." Restatement (Second) of Judgments § 27, p. 250 (1982). "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section [describing issue preclusion's domain] does not apply with respect to any issue in a subsequent action." *Id.*, comment e, at 257.

However, the issues sought to be "precluded" in *Arizona* were "raised" and (allegedly) "litigated" in a consent judgment that apparently resolved the action. *Id.* In this case, the Plaintiffs contend the issues were raised and litigated in dispositive motions that were denied. Response, docket #20 at 8-9. None of these denials resolved the actions; therefore, the question here is whether the previous denials may be considered "final judgments" for purposes of issue preclusion.

The Plaintiffs, who have the burden to demonstrate all four elements of issue preclusion, are silent on this question, except to assert that "the issues were briefed and [finally] decided by the Court [sic] and Vectrus elected not to appeal." Response, docket #20 at 9-10. As set forth above, federal law governs the scope of issue preclusion; however, this Court was unable to locate Tenth

Circuit law addressing specifically whether a denial of a dispositive motion is considered a "final judgment to which resolution of a particular issue was necessary."[5]  Some circuit courts seem to answer the question squarely in the negative.  *See, e.g., Financial Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 285 (5th Cir. 2006) (denial of a motion to dismiss is not a final judgment on the merits because the action continues after the denial); *see also St. Paul Fire & Marine Ins. Co. v. F.H.*, 55 F.3d 1420, 1425 (9th Cir. 1995) (a partial grant of summary judgment was not a final judgment for purposes of issue preclusion, because: "it could not have been appealed...when it was entered"; "[i]t was subject to reconsideration on proper motion"; and "[t]he court could, on its own initiative, revise the order at any time before judgment.").

However, other courts focus not so much on whether the previous order was a "final judgment" but, rather, on whether the issue was fully litigated in the previous order.  *See Global Naps, Inc. v. Verizon New England, Inc.*, 603 F.3d 71 (1st Cir. 2010) (finding that an order resolving discovery misconduct under Rule 37(b) was "final" for issue preclusion); *see also Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390 (7th Cir. 1986) (an earlier determination by a state court that the action was not a compulsory counterclaim in a different state court should preclude relitigation of that issue, even though there had not been a final judgment in the earlier action and there had been no opportunity for appellate review. The earlier decision was firm in the sense that reconsideration was not contemplated, there was ample incentive to litigate the issue vigorously, and the need for a final judgment on a whole case is not as great when the question is one of issue preclusion rather than claim preclusion); *American Postal Workers Union v. United States Postal Serv.*, 736 F.2d 317, 319 (6th Cir. 1984)) ("a [final] judgment is not required so long as there has

---

[5]However, federal law affirms that orders ***granting*** Rule 12(b)(6) motions are "final" for *res judicata* purposes.  *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.'").

been a final decision with respect to the issue to be given preclusive effect (in this case, the motion

to dismiss).").

In fact, the Tenth Circuit has determined that, with respect to an order denying arbitration,

"[r]egardless of the interlocutory nature of the order ... its preclusive effect for *res judicata* purposes

is derived from the finality of the decision." *Stifel, Nicolaus & Co., Inc. v. Woolsey & Co.*, Inc. 81

F.3d 1540, 1545 (10th Cir. 1996) (citing *Towers, Perrin, Forster & Crosby, Inc. v. Brown*, 732 F.2d

345, 349 (3d Cir.1984) ( "the preclusive effect of an order depends on what the order determines,

not on whether it is deemed interlocutory."); *see also Employees Own Fed. Credit Union v. City of*

*Defiance*, 752 F.2d 243, 245 (6th Cir. 1985) (relaxation of final judgment rule in collateral estoppel

context appropriate in civil case when prior decision is "sufficiently firm to be accorded conclusive

effect").  The court in *Stifel* found that the state court's order, which was appealed, was not "final"

because the appellate court did not reach the merits of the party's claim for arbitration.  *Id.*

Here, of course, the previous orders at issue are interlocutory orders denying motions to

dismiss and a motion for summary judgment.  Some authority exists demonstrating such orders have

no preclusive effect under certain circumstances.  *See Schor v. Abbot Labs*., 457 F.3d 608, 614-15

(7th Cir. 2006) ("Federal law determines the preclusive effect of a federal court's decision, and as

a matter of federal law the denial of a motion (whether under Rule 12(b)(6) or Rule 56), *so that a*

*suit continues and the issue remains alive*, has no preclusive effect.") (emphasis added); *see also*

Wright & Miller, 18A Federal Practice & Procedure § 4439 (denial of a motion to dismiss under

Rule 12(b)(6) "ordinarily is not a final judgment that will support issue preclusion *on the sufficiency*

*of an identical complaint filed in a different action*.") (emphasis added).

Review of these decisions leads the Court to conclude that it must determine from the

previous orders themselves[6] whether they are "final" for purposes of precluding the issues raised here – choice of law and DBA preemption.  *See Smith Mach. Co., Inc. v. Hesston Corp.*, 878 F.2d 1290, 1293 (10th Cir. 1989) ("Courts ... require a prior final judgment, *at least on the specific issues sought to be foreclosed from relitigation*, before a party may invoke collateral estoppel") (emphasis added).  In so doing, the Court will also address Vectrus' final contention that the issues raised in the previous actions were not identical to those presented here.

In arguing collateral estoppel based on a prior order, "it is essential to show the precise contours, if not the exact language, of that prior" order to determine what was "actually litigated" in the matter below.  *Kincaid v. Sturdevant*, 437 F. Supp. 2d 1219, 1224 (D. Kan. 2006).  "'[I]t is incumbent upon the party asserting the [collateral estoppel] defense to prove that the issues were actually litigated and determined in the former action.'"  *Strong v. Laubach*, 153 F. App'x 481, 486 (10th Cir. 2005) (quoting *Happy Elevator No. 2 v. Osage Const. Co.*, 209 F.2d 459, 462 (10th Cir. 1954)).

First, in *Marshall v. Exelis Sys. Corp.*, No. 13-cv-00545, 2014 WL 4212694, at *3 (D. Colo. Aug. 26, 2014), the Honorable Christine M. Arguello found, with respect to the choice of law issue, "the Court finds that on this particular set of facts, Colorado law applies" to the claim for outrageous conduct.  Judge Arguello then listed the set of facts as:

> Marshall, a citizen of the United States, worked for Exelis, a Colorado corporation with its principal place of business in Colorado. Exelis assigned Marshall to work on a United States military base in Afghanistan. When she believed she was retaliated against for reporting discriminatory conduct, Marshall contacted human resources employees in Colorado.

*Id.*  Judge Arguello further noted that other courts addressing the issue have applied the forum's law

---

[6]Courts are permitted to take judicial notice of court documents from previous actions when ruling on motions to dismiss based on preclusion grounds.  *Wash. v. U.S. Tennis Ass'n, Inc.*, 290 F. Supp. 2d 323, 326 (E.D. N.Y. 2003).

(as opposed to international law), and that the defendant, while asserting Afghanistan law applied, improperly sought dismissal without specifying how the claim should be dismissed under Afghanistan law. *Id.* With respect to the due process question, Judge Arguello found that, because the defendant was located in Colorado and the plaintiff contacted human resources personnel in Colorado to complain of discrimination, the choice of Colorado law was "neither arbitrary nor fundamentally unfair." *Id.* at *4.

Judge Arguello's decision appears to be a final order to which resolution of the choice of law issue was necessary under *Stan Lee Media* and *Stifel*, but the decision was determined on the specific "set of facts" in that case. Therefore, the Court must determine whether the issues presented there and the issues presented here are identical.

The Tenth Circuit in *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653 (10th Cir. 2006) cites the Restatement (Second) of Judgments § 27 cmt. c for factors that are relevant in distinguishing between situations where collateral estoppel is and is not appropriate when there is a lack of total identity between the particular matter presented in the second action and that presented in the first:

> [1] Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? [2] Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? [3] Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? [4] How closely related are the claims involved in the two proceedings?

*Id.* at 663 ("Where these questions can be answered in the affirmative, it is likely that the 'issue' involved in the two proceedings is the same.").

The Court agrees with Vectrus that Judge Arguello based her opinion in large part on the plaintiff's contacts with Colorado personnel in determining both the "most significant relationship"

and "due process" elements of a choice of law question.  In this case, the Plaintiffs' allegations reflect they reported alleged misconduct to various personnel, but none are identified as located in Colorado.  *See, e.g.,* Complaint, ¶¶ 54-61.  Because this difference causes the Court to answer "no" to questions 1 and 4 set forth in *B-S Steel of Kansas*, the Court cannot find that the issue presented to Judge Arguello and that presented here are identical for purposes of precluding Vectrus' argument concerning the Plaintiffs' outrageous conduct claim.

Second, the Plaintiffs cite the decisions in *Norwood v. ITT Sys. Corp.*, No. 10-cv-00052-RPM for their contentions that Vectrus' choice of law and DBA preemption defenses should be precluded.  In *Norwood*, the Honorable Richard P. Matsch denied a motion to dismiss the plaintiff's wrongful discharge claim finding that Colorado law applied although the alleged violations occurred in Afghanistan.  *Id.*, Order, February 10, 2010, docket #6.  Judge Matsch came to his decision without a reply brief from the defendant saying, "this Court is fully persuaded that as a Colorado employer, [defendant] is subject to the public policy of Colorado."  *Id.* at 2.

Vectrus argues, and this Court agrees, that the defendant in *Norwood* was not able to fully litigate the issue for purposes of issue preclusion where the court intercepted the defendant's ability to respond to the plaintiff in support of the motion.  *See Stan Lee Media*, 774 F.3d at 1297 ("[o]ur consideration of a party's prior "full and fair opportunity to litigate an issue '[o]ften ... will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'") (quoting *Murdock*, 975 F.2d at 689).

Judge Matsch also denied summary judgment in *Norwood*, after full briefing by the parties, referring to his previous order concerning application of Colorado law and finding that the plaintiff's claim was not preempted by the DBA because "that statute is limited to personal injuries and does

not preempt a state law claim for wrongful discharge." 2011 WL 221441, at *1 (D. Colo. Jan. 21, 2011). Although the defendant had the opportunity to brief the choice of law issue, this Court is not convinced that the defendant had the opportunity to "fully" litigate the issue given Judge Matsch's direct reference to his previous order. *Id.* And, given the brief (one-sentence) holding regarding the preemption issue, this Court cannot say whether the defendant had the opportunity to "fully" litigate that issue. *See Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970) ("Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel."); *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 599 (1948) (collateral estoppel "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained *substantially static, factually and legally*.") (emphasis added).

Accordingly, the Court finds collateral estoppel does not apply to preclude Vectrus' defenses of DBA preemption and choice (application) of proper law in this case.

## III.   Does the DBA Bar Plaintiffs' First and Third State Law Claims?

Vectrus contends that the Plaintiffs' claims for wrongful discharge and outrageous conduct are barred as preempted by the Defense Base Act. Congress passed the Defense Base Act, 42 U.S.C. §§ 1651-54 ("DBA") to provide workers' compensation coverage for certain classes of employees working outside the continental United States. *Kalama Servs., Inc. v. Dir., Office of Workers Comp. Programs*, 354 F.3d 1085, 1090 (9th Cir. 2004) (citing *Pearce v. Dir., Office of Workers Comp. Programs*, 603 F.2d 763, 765 (9th Cir. 1979)). "Rather than draft a new workers' compensation scheme, Congress used the DBA to extend the LHWCA [Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq.] to apply to the newly-covered workers." *Id.*

Vectrus argues that the LHWCA, as extended by the DBA, applies in this case. Specifically, Vectrus contends that because Plaintiffs allege "injury" from their employment at an overseas

United States military base, their claims arise under the DBA, which expressly incorporates the LHWCA as follows:

> The DBA provides, "[e]xcept as herein modified, the provisions of the [LHWCA] ... shall apply in respect to injury or death of any employee engaged in any employment – at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government; or upon any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States.

42 U.S.C. § 1651(a)(1)-(2).  The plain language of the DBA provides, "[t]he liability of an employer ... shall be exclusive and in place of all other liability of such employer, ... coming within the purview of this chapter under the workmen's compensation law of any State." 42 U.S.C. § 1651(c).

Plaintiffs challenge this defense asserting that the term, "injury," refers to bodily injury and death, not to monetary or emotional injuries.  The LHWCA provides:

> The term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2).

Before delving into the "injury" analysis, however, the Court notes Vectrus does not mention that the immunity provided by the DBA is contingent upon the employer obtaining insurance coverage for an injured or deceased employee.[7]  "[A]n employer that secures insurance coverage for its employees as required by the DBA is entitled to immunity under the LHWCA."  *Makris v. Spensieri Painting, Inc.*, 669 F. Supp. 2d 201, (D. P.R. 2009) (quoting *Colon v. United States*, 223 F. Supp. 2d 368, 370 (D.P.R.2002); *see also Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464,

---

[7]In this regard, the LHWCA provides at § 905(a):

> The liability of an employer prescribed in section 904 ... shall be exclusive and in place of all other liability of such employer to the employee ... except ... if an employer fails to secure payment of compensation as required by this chapter.

466, 469 (1st Cir. 2000) (the court found the employer was entitled to immunity under the LHWCA from injuries that occurred in Puerto Rico and noted the employer had "procured workers' compensation and employers' liability insurance from CIGNA, pursuant to its contract requirements with the Navy.").  Vectrus does not provide any information as to whether it has obtained insurance coverage for the injuries Plaintiffs allege here.

This requirement also relates to the question of the type of "injury" covered by the DBA. That is, except for the *Marshall* decision, Vectrus has cited no case extending the DBA's coverage to non-bodily injuries (or, injuries typically not covered by worker's compensation) that did not arise under worker's compensation or other medical benefits, and the Court has found none.

In *Marshall*, the question posed to the court was not whether the DBA's coverage extended to non-bodily injuries but, rather, whether the plaintiff's injuries arose from the "obligations or conditions" of employment that created a "zone of special danger." 2015 WL 1433274 at *4.  Judge Arguello determined that the plaintiff's "loss of housing" and defendant's order that she "immediately leave Bagram" arose from the obligations and conditions of her employment, so found the outrageous conduct claim preempted to the extent it alleged these injuries. *Id.* at *5.  However, again, the court did not address whether the DBA covered such injuries; accordingly, the Court does not find this decision persuasive.

Without binding or persuasive authority on this question, the Court will not extend the DBA's coverage to non-bodily injuries that do not arise from, or are not related to, worker's compensation issues.  Accordingly, the Court finds Vectrus has failed to demonstrate the Plaintiffs' claims for wrongful discharge and outrageous conduct, which do not allege bodily (physical) injuries or death and do not arise under the rubric of worker's compensation, are preempted by the DBA.

### III.   Does Colorado Law Apply to Plaintiffs' Claims?

The parties agree that this question should be answered by an analysis of Colorado's choice-of-law rules.   "A federal court sitting in diversity applies the substantive law, including its choice-of-law rules, of the forum state." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).   In tort cases, such as this one, Colorado's choice-of-law standard is the "most significant relationship" test, as articulated in the Restatement (Second) of the Conflict of Laws §§ 6, 145, 171 (1971) (the "Restatement").   *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 510 (Colo. 2007) (en banc).   In applying that test, a court should analyze the following contacts:

(a)   the place where the injury occurred,

(b)   the place where the conduct causing the injury occurred,

(c)   the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d)   the place where the relationship, if any, between the parties is centered.

Restatement § 145(2). Such contacts "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*   Further, § 145(2) requires a court to analyze the following factors listed in § 6 of the Restatement:

(a)   the needs of the interstate and international systems,

(b)   the relevant policies of the forum,

(c)   the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)   the protection of justified expectations,

(e)   the basic policies underlying the particular field of law,

(f)   certainty, predictability and uniformity of result, and

(g)     ease in the determination and application of the law to be applied.

Vectrus argues that, because the allegations reflect the conduct and injuries alleged by Plaintiffs

occurred in Afghanistan, the choice-of-law factors weigh in favor of applying Afghan law.  Plaintiffs

counter that two courts in this district have found Colorado law applies under "identical" facts.

Under the circumstances presented here, the Court disagrees with both positions.

First, as set forth above, the factual allegations/findings in *Marshall* are not identical to the

Plaintiffs' allegations here.  The Complaint contains no allegations that the Plaintiffs' reports were

directed at Vectrus personnel in Colorado.[8]  In addition, there are no allegations concerning the

Plaintiffs' employment contracts with Colorado and copies of such agreements have not been

provided to the Court.  As stated herein, Judge Arguello in *Marshall* relied on the plaintiff's

allegation that she contacted Colorado personnel for her "most significant relationship" analysis.

This Court finds *Marshall* distinguishable on its facts and will not apply its analysis here on such

"identical facts" basis.

Vectrus asserts that the choice-of-law factors weigh in favor of application of Afghan law

to Plaintiffs' claims.  The Court agrees that the first two factors – where the injury occurred and

where the conduct causing the injury occurred – point to Afghanistan.  But, the third and fourth –

where the parties reside and where the relationship is centered – are not so directed.  Rather,

although the Plaintiffs reside outside of Colorado, Vectrus is headquartered here and, thus, its

employment relationship with the Plaintiffs also is centered in Colorado.  Accordingly, the Court

will consider the additional factors to determine which law should apply here.

In that sense, Judge Arguello in *Marshall* asserts "other courts have declined to apply foreign

law in cases involving injuries that occurred outside of the United States because plaintiffs face

---

[8]Again, Plaintiffs do not dispute Vectrus' assertion that human resources personnel were also
located in Afghanistan.

accessibility issues. ... Likewise, courts have determined that domestic law applies to tort claims for injuries sustained in Afghanistan." 2014 WL 4212694, at *3 and n.2 (citing cases). The Court finds Judge Arguello's opinion in this sense and the cases she cites persuasive in considering factors (a), (f), and (g). In considering factor (c), the Court finds Vectrus, while citing to Afghan employment law and rules of civil procedure, does not persuade the Court that such law and rules would apply to United States citizens allegedly suffering injuries on a United States military base. *See id.* (citing *Mutual Serv. Ins. v. Frit Indus.*, 358 F.3d 1312, 1321 (11th Cir. 2004) ( "The district court is not required to conduct its own research into the content of foreign law if the party urging its application declines to do so.")). Moreover, any expectation that Colorado law would be applied to employment claims brought against a Colorado-based employer cannot be said to be "unjustified" for purposes of factor (d). *See Norwood*, 2011 WL 221441 at *1 ("the defendant is an employer in Colorado and Colorado has clear authority to regulate the conduct of a Colorado employer in discharging an employee.").

Accordingly, the Court finds a balancing of the choice-of-law factors weighs in favor of finding the "most significant relationship" in Colorado. In addition, the Court agrees with the analysis in *Marshall* for Vectrus' due process defense, despite Judge Arguello's reference to the plaintiff's direct contact with Colorado personnel. 2014 WL 4212694, at *3-*4. It is enough that Vectrus

> is a Colorado corporation with its principal place of business in Colorado Springs. As in *Allstate* [*Ins. Co. v. Hague*, 449 U.S. 302, 307-08 (1981) (plurality opinion)], by virtue of [Vectrus'] presence in Colorado, it "can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the state courts might apply forum law to litigation in which the company is involved." *Id.*

*Id.* at *4. "If a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional." *Allstate*, 449 U.S. at 309-11 (finding

unconstitutional the application of a state's law where the only contact was the plaintiff's "nominal, permanent residence" in that state, and where a decedent's spouse moved from one state where the injuries occurred to her husband to a state whose law was applied). Here, the Court finds Vectrus' location of its headquarters in Colorado, together with its employment relationship (transaction) with the Plaintiffs from which Plaintiffs' claims arise, are sufficient to demonstrate Colorado has a "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* at 313.

IV.    **Do Plaintiffs State Plausible Claims for Outrageous Conduct?**

Vectrus contends that, even if Colorado law applies, the Plaintiffs do not state plausible claims for outrageous conduct because "the claimed outrageous conduct is part and parcel of the employment claim." Motion, docket #6 at 22. Plaintiffs counter that their allegations regarding "impairing Cross's security clearance; intimidation and harassment of Defendants; transferring Walker and Wascher to the dangerous forward operating bases; and the complicity of Defendants' HR Department's 'investigation' of Plaintiffs' claims, where members of the HR department directly fed the confidential information provided by Plaintiffs to the individuals engaged in the illegal conduct in an effort to conceal the misconduct" suffice to demonstrate conduct that is separate and distinct from allegations supporting their wrongful termination claims. Response, docket #20 at 16.

To prove outrageous conduct under Colorado law, a plaintiff must demonstrate: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (en banc). Vectrus' actions must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

37

> civilized community. Generally, the case is one in which the recitation of the facts
> to an average member of the community would arouse his resentment against the
> actor, and lead him to exclaim, "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v. McCarty*, 173

Colo. 170, 476 P.2d 753, 756 (1970)).  "Proof of the tort of outrageous conduct must consist of

either an extreme act, both in character and degree, or a pattern of conduct from which the

ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and

calculously inflicted."  *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo.

1994).  Although "the question of whether conduct is outrageous is generally one of fact to be

determined by a jury, it is first the responsibility of a court to determine whether reasonable persons

could differ on the question."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999)

(quoting *Culpepper*, 877 P.2d at 883).

After citing applicable law, Vectrus asserts simply that Plaintiffs' allegations "do not rise to

the level necessary to support a claim of outrageous conduct."  Motion, docket #6 at 24.  The Court

agrees with respect to Plaintiffs' characterization of their allegations; simply referring to

"intimidation and harassment of Defendants" (which the Court construes as "*by* Defendants," not

that Defendants suffered intimidation and harassment) is insufficient for this Court to determine

whether a reasonable person could find Vectrus' conduct to be "outrageous."

Plaintiffs refer the Court to allegations in specific paragraphs of the Complaint in support

of their position.  Response, docket #20 at 16 (citing Compl. at ¶¶ 41, 47-48, 50, 54, 64-66, 73-77,

88-90).  A review of these paragraphs reveals no "intimidation or harassment" against the Plaintiffs

that a reasonable person would find going "beyond all possible bounds of decency, and [being]

regarded as atrocious, and utterly intolerable in a civilized community" (*Coors*, 978 P.2d at 666),

particularly where there are no allegations that the Plaintiffs suffered particular severe emotional

injury from the alleged "intimidation and harassment." *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1165 (10th Cir. 1981).

As for the other identified allegations, Vectrus contends they are duplicative of the Plaintiffs' wrongful discharge claims. The facts necessary to prove a claim for outrageous conduct "cannot be similar or identical to, nor can they be said to share a common nucleus of operative facts with, the federal statutory claims over which [the court] has original jurisdiction." *Gard*, 859 F. Supp. at 1354; *see also Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1021 (D. Colo. 2000) (noting under Colorado law, "where the allegations forming the basis of a claim for outrageous conduct are the same as those forming the basis for a claim of discrimination, and nothing more, they fail to state an independently cognizable claim for which relief can be granted under Rule 12(b)(6).") (citing *Visor v. Sprint/United Mgmt. Co.*, 965 F. Supp. 31, 33 (D. Colo. 1997) (holding plaintiff's allegations forming the basis of a claim for outrageous conduct must exceed those which would state a colorable claim of discrimination)).

The Court notes first that Plaintiffs' allegation meant to support their claims for outrageous conduct – "the complicity of Defendants' HR Department's 'investigation' of Plaintiffs claims, where members of the HR department directly fed the confidential information provided by Plaintiffs to the individuals engaged in the illegal conduct in an effort to conceal the misconduct" – is insufficient for the simple reason that the Plaintiffs neither allege nor argue how they were injured (outside of the wrongful termination context) by such conduct.

As to the remaining allegations and taking them as true for purposes of this analysis – "impairing Cross's security clearance" and "transferring Walker and Wascher to the dangerous forward operating bases" – the Court finds first there is insufficient factual development at this point to determine whether they rise to the level of extreme conduct and, if developed sufficiently, a

reasonable person could regard such conduct as "atrocious."  Second, the Court concludes these allegations, as currently stated, are sufficiently separate and distinct from those allegations supporting Plaintiffs' wrongful discharge claims.  That is, the alleged impairment of Cross' security clearance occurred after his termination of employment, and Walker's and Wascher's transfers occurred several months before they were discharged in an alleged "draw-down" (or, what the Court perceives as a reduction in force).

Accordingly, the Court will grant Vectrus' motion to dismiss Plaintiffs' outrageous conduct claim to the extent it relies on conduct other than the impairment of Cross' security clearance and the transfers of Walker and Wascher to the forwarding operating bases.

## CONCLUSION

Defendants Spann and Daniel have demonstrated that this Court lacks personal jurisdiction over them; thus, the Court will grant their motion pursuant to Rule 12(b)(2) and dismiss Plaintiffs' claims against them without prejudice.

The Plaintiffs have failed to show Defendant Vectrus is collaterally estopped from raising their defenses of "choice-of-law" and "DBA preemption."  That said, Vectrus has failed to demonstrate the Plaintiffs' state law claims are preempted by the DBA and that Afghan, as opposed to Colorado, law should apply to Plaintiffs' claims.  However, Vectrus sufficiently demonstrates that any alleged conduct, other than the impairment of Cross' security clearance and the transfers of Walker and Wascher, fails to state plausible outrageous conduct claims.

THEREFORE, Defendants Spann and Daniel's Amended Motion for Dismissal Pursuant to Rule[s] 12(b)(1), 12(b)(2), and 12(b)(6) [filed January 25, 2016; docket #22] is **granted** pursuant to Fed. R. Civ. P. 12(b)(2) and **denied** in all other respects.  Plaintiffs' claims against Spann and Daniel are dismissed without prejudice in this case.

FURTHER,  Defendant Vectrus Systems Corporation's Motion for Partial Dismissal [filed December 15, 2015; docket #6] is **granted in part and denied in part** as follows:

(1)     Plaintiffs' claims for wrongful discharge in violation of Colorado's public policy (First Claim for Relief) will proceed against Vectrus in this matter;

(2)     Plaintiffs' claims set forth in their Second Claim for Relief were not challenged by Vectrus' motion and, thus, will proceed against Vectrus; and

(3)     Plaintiffs' claims for outrageous conduct (Third Claim for Relief) will proceed against Vectrus as to Plaintiffs Cross, Walker, and Wascher and as set forth in this order, but are dismissed as to Cjeka and Lytle.

Dated at Denver, Colorado, this 9th day of March, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge