IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02418-MEH

VICTOR CEJKA,
JAMES WALKER,
STEVEN WASCHER,
JAMIE LYTLE, and
PAUL CROSS,

      Plaintiffs,

v.

VECTRUS SYSTEMS CORPORATION, f/k/a Exelis Systems Corporation,

      Defendant.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF PAUL CROSS' FIRST AND THIRD CLAIMS FOR RELIEF

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiffs initiated this employment action against Defendants on October 30, 2015, alleging essentially that they suffered adverse employment actions in retaliation for reporting what they believed to be improper conduct affecting security at Bagram Air Force Base in Afghanistan. Plaintiffs allege claims against their former employer, Defendant Vectrus Systems Corp. ("Vectrus"), for common law retaliatory termination (Claim I); violation of 10 U.S.C. § 2409, the Department of Defense whistleblower statute (Claim II); and common law outrageous conduct (Claim III).[1] Here, Vectrus seeks summary judgment in its favor on Plaintiff Paul Cross' ("Cross") first and third claims for relief. The Court finds Cross has raised genuine issues of material fact regarding whether Vectrus wrongfully discharged him, but he has failed to do so demonstrating that

---

[1] Claim III was limited in scope by the Court's March 9, 2016 order granting in part Defendants' motion to dismiss. *See* ECF No. 35.

Vectrus engaged in outrageous conduct. Therefore, the Court grants in part and denies in part Vectrus' motion.

**FINDINGS OF FACT**

The Court makes the following findings of fact viewed in the light most favorable to Cross, who is the non-moving party in this matter.[2]

1.      On June 27, 2007, Fluor Corporation ("Fluor") entered into contract number W52P1J-07-D-0008 (the "Prime Contract") with the U.S. Department of the Army to provide services to the Logistics Civilian Augmentation Program ("LOGCAP") in Afghanistan.

2.      Vectrus, previously known as Exelis Systems Corporation and ITT Systems Corporation, is a Delaware corporation, with its principal place of business in Colorado Springs, Colorado.

3.      On June 20, 2008, Vectrus entered into a subcontract with Fluor, titled "Blanket Ordering Agreement," to provide support for the LOGCAP program in Afghanistan (the "BOA").

4.      Plaintiff Paul Cross was hired by Vectrus effective January 28, 2010 as a lead security investigator on the LOGCAP program. Deposition of Paul Cross, January 30, 2017 ("Cross Dep.") 111: 4–7.

5.      Prior to working for Vectrus, Cross served in the U.S. Air Force Security Police and the U.S. Army. *Id.* 17: 3–9; 60:14 – 61:2.

6.      At Vectrus, Cross, along with other security investigators (or "screeners") including Plaintiffs, worked at Bagram Air Force Base ("BAF") in Afghanistan in a Force Protection Screening Cell ("FPSC")[3] and reported to Brandon Spann ("Spann"), senior security supervisor, who

---

[2]Unless cited, these facts are undisputed by the parties.

[3]The "cell" was also known as "ECP-1," or Entry Control Point 1, which was the primary foot traffic gate for BAF. Approximately 6,500 to 7,300 persons would pass through the gate on a daily basis. Deposition of David Cleary, Dec. 1, 2016 ("Cleary Dep.") 27: 22 – 28: 4.

reported to Kevin Daniel ("Daniel"), regional manager, who reported to Richard Diaz ("Diaz"), program manager.

7.     The security investigators, including Cross, conducted interviews and investigations required for the issuance of access badges to over 6,500 non-military personnel for daily entry to the military base. Investigators prepared investigation reports (known as "dossiers") which, along with fingerprints, iris scans, and facial photos, were entered into the Biometric Automated Toolset System computer database ("BATS"), a security database maintained by the Department of Defense ("DOD") and shared with the United States' NATO allies. Answer ¶ 30, ECF No. 104; Deposition of Andrew Albright, Dec. 21, 2016 ("Albright Dep.") 19: 11–25; 22: 5 – 24: 4.

8.     The maintenance of accurate information in BATS was vital to the security of the base and the military's other bases throughout the world.  Albright Dep. 26: 2–13; 27: 2–19.

9.     The dossiers summarized the security investigations and recommendations for access to the base (as well as other privileges such as access to laptops, cell phones, or even in some instances weapons), but only the military was authorized to issue access badges.  Deposition of Victor Cejka, January 26, 2017 ("Cejka Dep.") 109: 23 – 110: 16.

10.     While the screening cell was supervised by Spann, Cejka also reported to the military oversight officer, Sergeant First Class John Salinas ("SFC Salinas").[4]  Cejka Dep. 121: 15–21.

11.     In January or February 2013, Spann told a group of "leads," including Cross, "If I want somebody to have access to BATS, you will . . . allow them access, and I don't [care] if they're a foreign national or whatever. If they're from Fluor, you give them access."  Cross Dep. 170: 5–18. Cross refused, then reported Spann's directive to another security lead, two screening cell managers, and Daniel.  *Id.* 170: 19–22; 171: 13 – 173: 19.  He also reported the directive to military oversight.

---

[4]SFC Salinas was the military oversight officer at the FPSC during most relevant times in this case; however, at other relevant times, James Fox was the military oversight officer.

*Id.* 174: 2–18.

12.    In April or May 2013, Vectrus Human Resources ("HR") personnel asked Cross to complete a statement in response to a complaint from Agron Fana, biometrics clerk, following a meeting at which Gary Blanchard, security supervisor, "counseled" Fana about his error in "merging two BAT dossiers"; Cross was also present in the meeting.  Cross Dep. 48: 11 – 49: 15.  Cross responded to HR in or about July 2013 by email (*id.* 254: 19 – 255: 4), and at the bottom of the statement, Cross wrote, "Look, I need to talk to you in person, face-to-face, because I have some information about other stuff going on that involves Agron Fana specifically and Kevin Daniel. . . . [p]lease get ahold [sic] of me as soon as you can." *Id.* 49: 15–24.

13.    Cross testified that HR personnel never responded to his request and, thus, he did not know who to trust at Vectrus.  *Id.* 95: 8–22.

14.    Cross had wished to discuss with HR his belief that "in 2011 and 2012 Agron Fana had been issuing badges and doling out privileges to [third country national] friends of his without authorization from the U.S. military.  Kevin Daniel and Brandon Spann knew of this but swept it under the rug and allowed Agron Fana to remain working at the FPSC in a trusted position."  He suspected that the same conduct was happening in 2013.  *Id.* 255: 5–24.

15.    Cross also testified that he confronted Spann about Spann giving information from the screening cell to Fluor officials, particularly to Jim Brown, Fluor security specialist, since all such information was "proprietary knowledge . . . for the U.S. government" and "we are not allowed to talk to any other company, civilian or otherwise, about it, especially without military oversight's approval."  Cross Dep. 96: 12 – 97: 25.  Cross brought this matter also to the attention of Daniel, Specialist Siewell (who worked in military oversight), and SFC Salinas.  *Id.* 99: 23 – 100: 12.

16.    Cross provided to military oversight a report he received from Plaintiff Jamie Lytle that

another Vectrus employee, Carl Lynch, was permitting drugs, alcohol, and prostitutes to come on base through the "turnstiles" at the entrance. *Id.* 196: 24 – 197: 7; 198: 4–21. He "never mentioned Brandon Spann" when discussing drugs or prostitution to the different agencies to which he reported. *Id.* 193: 25 – 194: 7.

17. In or about July or August 2013, some security investigators reported to Cross that another security investigator, Marc Salazar, was conducting "secret interviews and interrogations in his office . . . at the direction of Brandon Spann." Cross Dep. 41: 16–23.

18. Cross testified that one day thereafter, he saw Jim Brown leave Salazar's office, look at Cross nervously, and leave through the back door. Cross asked Salazar, "What was Jim Brown doing in there with the interpreter and the subject you were interviewing?" He answered, "Well, he was participating in the interview." Cross said, "Well, you know we have to get military oversight approval [because before we have anybody, even FBI, participating in the interview, we have to get their approval]." Salazar said, "Well, Brandon Spann authorized that." Cross attests that he immediately went to Brandon Spann and asked him if military oversight had approved Jim Brown's attendance in the interview. Spann "kind of looked away and hesitated and then back" to Cross and said, "Yeah, he–he authorized it." *Id.* 42: 2–22.

19. Cross testified that immediately thereafter, he went to military oversight — "a DOD civilian by the name of Siebert, Seaquest, something like that [Specialist Siewell] — and asked him, "Sir, did you authorize Jim Brown from Fluor to participate in an interview today with Marc Salazar?" Siewell answered, "No. I've never even heard of that." Cross asked, "Have you ever authorized that?" Siewell said no, he had not. *Id.* 42: 23 – 43: 8; 98: 14 – 99: 8.

20. Cross then went straight to Kevin Daniel and reported what he saw and heard saying, "We're not allowed to do that. We can't have anybody participating in interviews outside of the screening

cell unless military oversight approves." Daniel responded that he would talk to Brandon Spann and make sure it did not happen again. Thereafter, Daniel and Spann "avoided" Cross and rarely talked to him. Cross got the feeling that he "had stumbled onto something" and that Spann and Daniel were "up to something," so Cross felt he had to "watch [his] back." *Id.* 43: 9–22.

21.     Cross testified that he also saw Brown come out of the office of another security investigator, Bernard Hall, whose office was located across from Cross' office. Hall told Cross that Brown had attended the interview at Spann's direction and without the approval of military oversight. *Id.* 215: 15 – 216: 14.

22.     SFC Salinas testified that Cross came to him in or about July 2013 and reported that Spann Brown had been sitting in on interviews that involved Fluor employees. SFC Salinas confirmed that to protect the integrity of the investigation, only the screener, interviewee, translator, and Salinas were authorized to sit in screening interviews. Deposition of John Salinas, November 30, 2016 ("Salinas Dep.") 44: 7–8; 45: 20 – 46: 21; 137: 20 – 138: 2. After Salinas "briefed" the proper procedure, Spann told SFC Salinas that he "was going to take care of his people his way." *Id.* 140: 2–7. SFC Salinas had no knowledge that the reported conduct occurred again. *Id.* 141: 3–8.

23.     At or about the same time that Cross reported to Daniel what he perceived to be unauthorized access by Fluor to Salazar's interviews, Cross also reported his belief that Salazar "pencil-whipped" his dossiers (i.e., input incorrect or no information obtained during the interview), conducted improper or unnecessary interviews, and failed to conduct his share of screening interviews. Cross Dep. 144: 21 – 145: 14; 148: 2–16.

24.     Cross testified that after reporting to military oversight the interviews at which Brown attended and other perceived problems, he went back to Spann's and Daniel's office to inform them that he had made the reports. *Id.* 214: 17 – 215: 14.

25.　　On July 17, 2013, Vectrus security supervisor Gary Blanchard notified Fluor security that he found material inside a "work instructions" document identified as "secret" or "classified." Report, ECF No. 124-1.

26.　　Fluor security manager, Jeremiah Keenan, conducted an investigation of this report, which raised potential violations of the National Industrial Security Program Manual ("NISPOM"), during which he interviewed and procured witness statements from several Vectrus employees, including Cross. *Id.*

27.　　On July 18, 2013 at 11:51, Cross completed a statement concerning his conduct with respect to a "training document . . . on how to join multiple dossiers in BAT."[5]  July 18, 2013 Statement, ECF No. 129-34 at 38.  Cross stated that he created the document on "the share drive" in the "Centrix" system, added some "screen shots of BAT dossiers" as examples, and put copies of the document in "screeners' sub folders," but did not put the document on a thumb drive, did not make a copy of the document off of Centrix, and never plugged his thumb drive into the Centrix system. *Id.*  Cross states that he gave Keenan and Jim Brown (who apparently assisted with the investigation) his thumb drive at their request.  Cross Dep. 274: 17–22.

28.　　Later that day at 16:17, Cross completed a second statement concerning the same training document.  July 18, 2013 Statement, ECF No. 129-34 at 39.  In this statement, Cross asserted:

> I can't remember 100% because it was very hectic at the time but if I remember correctly, Jackie needed the document to use for training to show the bio-clerks the proper way to join dossiers. This was about the time that one of the other Bio-Clerks had made a slight mistake on the proper procedure for joining multiple dossiers. I thought I had just given it to her on Centrix, but looking back, I think that I did indeed give her a copy on my thumb drive for some reason. I plugged my thumb drive into BAT and retrieved the document without fully reviewing what was on it. I then gave the thumb drive to Jackie. Afterwards, I thought that I had completely

---

[5]The acronym "BAT" here also stands for "Biometric Automated Toolset," which is the "collection device[ ] that will take a retina [print] and fingerprint . . . every fingerprint that's been taken around the globe is stored in one database in West Virginia."  Mot. 7; Albright Dep. 22: 5–13.

deleted the file on the thumb drive and had only my toolbox and some TV shows on it.

*Id.* Cross states that he created this statement after Keenan and Brown returned to his office saying there was a training document on the thumb drive; Cross "had to think about it for a second . . . and "go back and kind of – kind of retrace [his] steps" because he "honestly didn't think that [he] put it on the thumb drive." Cross Dep. 275: 9–21. Cross went to Brown and Keenan, who were at the copy machine, and told them that he had forgotten but remembered copying the document onto the thumb drive and asked whether he could change his statement. Brown or Keenan answered that it was "no problem" and "we'll just tear this up," referring to his first statement. *Id.* 276: 1–11.

29.     Cross recalled later that about a week or two prior to utilizing the thumb drive for Conklin, Daniel had directed him to use a thumb drive to retrieve and copy training documents from the Centrix system. Cross Dep. 34: 23 – 36: 11; 39: 19 – 40: 16. Although Cross protested that he previously had been "chewed once for doing that," Daniel "assured him that it was okay." *Id.* 105: 14 – 106: 5.

30.     In or about August 2013, Plaintiff Wascher was asked to conduct an investigation of a person suspected of possessing a cell phone, which was not allowed on base absent military approval. Deposition of Steven Wascher, January 23, 2017 ("Wascher Dep.") 107: 8 – 108: 10. Wascher interviewed the suspect and, during a break, Daniel approached Wascher and told him that he "knew for a fact" that "she does have a cell phone" because either "Agron or Artan [Fana] gave her the phone" to arrange "meetings" with her during lunch or in the evenings. *Id.* 110: 17 – 111: 13; 139: 17–19.

31.     Immediately following the interview with the suspect, Wascher completed a dossier on the BATS, in which he included the information Daniel reported to him. *Id.* 111: 20–25, 112: 1.

32.     The next morning, Plaintiff Lytle told Wascher that Conklin had approached him saying that

someone had deleted information from Wascher's reports. *Id.* 112: 15 – 113: 6. That "someone" according to Conklin was Shajaida Rivera, biometrics clerk, who allegedly deleted information at Spann's request. *Id.* 101: 14–23.

33.     Wascher reviewed the previous day's report and discovered that the information Daniel had given him was missing. *Id.* 114: 4–12.

34.     Wascher reported the missing information to Cross, who told him to put the information back into the report, file it, and save a copy of the report. *Id.* 114: 13–22. Wascher did so, then sent an email to Cross, Tom Robin, Spann, and Daniel "informing them of the deletion of details in [his] report, [and] asked them if they could provide an explanation and what . . . steps would be taken to rectify it." *Id.* 115: 4–11. Only Cross responded to the email saying he would speak to Spann about the matter, but Wascher had no knowledge whether Cross ever did. *Id.* 116: 14–24.

35.     The next day, Wascher sent a second "exact same" email "to ensure that everyone was receiving the email." *Id.* 116: 1–3. That morning, in the daily security meeting, the security investigators "discussed reports being altered" in a general sense and that "everyone should double check their reports when they're filed to make sure everything's right, in case there's any alterations." *Id.* 119: 3–19.

36.     Later that day, Wascher and Cross were called to Spann's office, in which Daniel was also present, and Spann "yelled" at Cross asking whether Cross was "telling people that reports had been altered." *Id.* 117: 6–21. When Cross answered that he was "checking to see what was going on," Spann told him to "never bring it up, never talk about it, drop the subject immediately." *Id.* 117: 22 – 118: 2.

37.     Wascher states that he did not report the alterations to the military; rather, Specialist Siewell approached Wascher two to three days later saying there was going to be an investigation concerning

the alterations.  *Id.* 120: 11 – 121: 21.  Wascher later learned that it was likely Conklin who informed Siewell that she suspected Rivera had altered the reports.  *Id.* 123: 13–19.  Wascher also learned later from Siewell that the deletions were, in fact, made from Rivera's computer.  *Id.* 133: 5–17.

38.  Cross recalls that he first learned about the deletion of Wascher's report when Wascher "had come in to talk to" him.  Cross Dep. 119: 1–5.  Cross asserts that he did not report his suspicion that either Spann or Daniel deleted the information from Wascher's report, because he "was fired while [he] was on R&R before [he] could talk to anybody."  *Id.* 122: 25, 123: 1–6.

39.  SFC Salinas first testified at his deposition that both Cross and Wascher brought the alterations to his attention in or about August 2013.  Salinas Dep. 43: 9–15; 54: 15 – 55: 13.  He testified later, however, that Wascher reported the problem to him verbally with no one else present.  *Id.* at 167: 10–14; 168: 17 – 169: 3.

40.  Cross testified that he did not report to Vectrus what he suspected was "illegal" or "immoral" conduct by Spann because "[Vectrus] had no business knowing that. . . . "[t]hat would be like giving [Cross] classified information . . . instead of giving it to the proper authorities, CID."  Cross Dep. 94: 15–23.

41.  On August 21, 2013, Fluor notified Vectrus that it had completed the investigation of purported NISPOM violation involving classified material found in a work instruction document, produced its findings to Vectrus, and "directed that [Vectrus] now conduct [its] own investigation and provide [Fluor] a corrective action plan by 30 August."  Tucker Email, August 21, 2013, ECF No. 124-1 at 44–45.

42.  Vectrus' Mission Systems security specialist, Eric Schultz, conducted the investigation from August 22–28, 2013, and with respect to Cross, found the following:

Conklin was instructed by Spann to update the "Biometric Badging" work instruction and used a version given to her by Security Officer Lead Ivy Davis (unassociated with this investigation). Conklin requested assistance from Cross who provided her with a personally owned USB storage device containing a previously generated work instruction which had screen capture images he had taken from BATS sometime in 2012. Cross provided a written statement initially denying Conklin's assertion that he provided her with the information, a USB storage device or had ever inserted a USB storage device into a BATS computer. An inspection of the USB storage device by Fluor Security provided evidence to refute Cross' claim. Cross then recanted his previous written statement admitting to providing Conklin with the aforementioned information. A complete inspection of all other Security Investigators' assigned computers by Fluor Security yielded negative results for classified information or the utilization of USB storage devices.

Schultz Report, ECF No. 124-1 at 51.

43.    Schultz made the following determination regarding Cross following his investigation:

> Cross. Paul (Security Investigator Lead) - Per DoD 5220.22-M Chapters 1-304(a.), 5-100, 5-500, 5-600, 8-100, 8-105(c.). Cross deliberately disregarded security requirements, displayed negligence in the handling of classified information and obstructed the course of an official investigation by providing false and misleading information. Cross initially claimed in a written statement that he had never copied information from a BATS computer or utilized a USB storage device to pass information to Conklin. During a subsequent interview and inspection of his personally owned USB storage device Cross redacted his original statement and said he had taken information from BATS and placed it on his personally owned USB storage device and passed it to Conklin. Cross acted with negligence when he utilized a personally owned USB storage device to download classified information from a Government owned IS.

*Id.* at 54–55.

44.    On August 29, 2013 at 10:05, Michael Hobbs, Vectrus' deputy program manager, sent an email to Program Manager Diaz (and copied other Vectrus personnel, Michael Schneider, Venola Riley, senior HR manager, Schultz, and Larry Maker) regarding the investigation and stated, *inter alia*, that "[o]verall, the findings were in line with Fluor's investigation to some degree." Hobbs Email, August 29, 2013, ECF No. 124-1 at 39–40. Hobbs copied Schultz' findings concerning Cross and the other "subjects" into the email. *Id.* at 41. He also listed "recommended corrective [personnel] actions," including that Cross' employment be terminated. *Id.* at 43.

45.    That same morning at 10:44, Riley forwarded Hobbs' email to Douglas Brown, HR supervisor.  Riley Email, August 29, 2013, ECF No. 124-1 at 39.  Later that morning at 11:47, Brown emailed Riley stating, "Based on the investigation conducted by Fluor Security and all pertinent statements and documentation reviewed, HR recommends the following action for all employees involved:" and listing "termination of employment" for Cross.  Brown Email, August 29, 2013, ECF No. 124-1 at 22–26.

46.    Two days later, on August 31, 2013, Spann was interviewed by Bridget Bailey regarding "Case Number: SYS-25813 & SYS-29713."  Bailey asked Spann to describe the current working environment at the screening cell; he answered describing "issues with Gary Blanchard" and mentioned "reports of NISPOM violations recently," then stated:

> Other than that, we're doing okay. Working past the NISPOM violation issue, sorting that out. Some people will get counseled including Security Investigator Lead Paul Cross, which is a surprise, but he lied about something so HR says we're doing [a] FWW [final written warning].

Interview Information Sheet, ECF No. 159-30.

47.    On September 4, 2013, Brown emailed Melanie White, Employee Relations analyst, "requesting Termination for Mr. Paul Cross for [the following] violation[s]."  Brown Email, September 4, 2013, ECF No. 137-1 at 2.  Brown noted that "Termination is supported by: Program Manager, Richard Diaz and HR Manager, Venola Riley."  *Id.*

48.    On September 10, 2013, White emailed Brown asking him to "[p]lease explain why Mr. Cross was sent forward for termination but [other] employees were recommended for either suspension or FWW."  White Email, September 10, 2013, ECF No. 124-1 at 19–20.  Brown responded:

> [Cross] mishandled classified information and utilized an unauthorized storage device; and unlike the others, the employee obstructed an official investigation by providing false information, which was later found through a subsequent interview

and inspection of his storage device. Based on the [ ] employee's department and position title, the Project found these actions inexcusable and recommended termination.

*Id.* at 19.

49.     On September 12, 2013, White emailed Yolanda Adrian and Jessica Parafiniuk at Vectrus headquarters stating, "LOGCAP requests approval to terminate employment of Paul Cross . . ." and "I agree with this termination request."  White Email, September 12, 2013, ECF No. 137-1 at 1.

50.     Vectrus terminated Cross' employment effective September 13, 2013 and notified Cross of his termination by email dated September 13, 2013.  Cross Dep. 282: 8–12.

51.     On September 15, 2013, Cross emailed Plaintiff Wascher saying, "Yeah, I found out a couple of days ago that they fired me. I really don't [think] of it as them screwing me so much as I screwed myself. I only have one person to blame for what happened ... me."  Cross Email, September 15, 2013, ECF No. 129-34 at 34; Cross Dep. 19: 13–1.

52.     In email correspondence dated September 18, 2013, Cross told Wascher, "Kinda worried a wee bit. I'm pretty sure they got me dead to rights on the termination and doubt they'd lose on a wrongful termination suit. There is solid evidence of my wrongdoing."  Cross Email, September 18, 2013, ECF No. 129-34 at 35.  Cross then asked Wascher to "hold off right now on pursuing" any lawsuit alleging a wrongful termination on Cross' behalf.  *Id.*

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit

under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir.

2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

<u>**ANALYSIS**</u>

Vectrus argues that Cross fails to demonstrate genuine issues of material fact supporting his claims for wrongful discharge in violation of public policy and for outrageous conduct. The Court will address each claim in turn.

**I.      Wrongful Discharge in Violation of Public Policy**

"To avoid summary judgment on his claim of wrongful discharge in violation of public policy," Cross is "required to adduce sufficient evidence to create a genuine issue of material fact on each element of the tort." *Mowry v. United Parcel Serv., Inc.*, 280 F. App'x 702, 707 (10th Cir. May 29, 2008) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). A plaintiff makes a prima facie case of wrongful discharge against public policy by presenting evidence:

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited him from performing a public duty or exercising an important job-related right or privilege; [2] that the action directed by the employer would violate a specific statute on the public health, safety or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or his right or privilege as a worker. The plaintiff must also show [3] that the employee was terminated as the result of refusing to perform the act directed by the employer, and [4] that the employer was aware or reasonably should have been aware that the employee's refusal to comply with the employer's order was based on the employee's reasonable belief that the action ordered was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employees legal right or privilege as a worker.

*Barlow v. C.R. England, Inc.*, 703 F.3d 497, 507 (10th Cir. 2012) (citing *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1235 (10th Cir. 1997) and *Martin Marietta Corp. v. Lorenz*,

823 P.2d 100, 109 (Colo. 1992) (en banc)). In the context of a "whistleblower" action such as that alleged here, the elements of the claim are:

(1)     the plaintiff was employed by the defendant;

(2)     the defendant discharged the plaintiff; and

(3)(a)   the discharge was in retaliation for exercising a job-related right or performing a specific statutory duty, or

(3)(b)   the discharge would undermine a clearly expressed public policy.

*Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008) (citing *Lorenz*, 823 P.2d at 109 and *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1373 (Colo. App. 1989)). "[U]nder the third prong, in order to survive summary judgment, a plaintiff must 'present evidence that [his] termination was causally connected to [his exercise of a job-related right or performance of a statutory duty].'" *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1256 (D. Colo. 2012). "Additionally, the plaintiff must allege that the 'public policy invoked truly impacts the public in order to justify interference into an employer's business decisions.'" *Mullin v. Hyatt Residential Grp., Inc.*, 82 F. Supp.3d 1248, 1252 (D. Colo. 2015) (quoting *Kearl*, 205 P.3d at 499).

Vectrus does not dispute that Cross has satisfied the first two prongs of a wrongful discharge claim. Reply 5. Vectrus argues instead that the statutes/regulations under which Cross reported alleged unlawful conduct did not apply to the Plaintiffs and/or did not further Colorado's public policy, and Cross has failed to raise genuine issues of material fact demonstrating causation. Cross counters that the statutes/regulations on which he bases his claim are sufficient under Colorado law, and that his termination was pretext for retaliation as demonstrated by inconsistencies in the investigation and the fact that others engaged in the same conduct but were not terminated.

A.     Public Policy

In *Bleil v. Williams Prod. RMT Co., LLC*, 911 F. Supp. 2d 1141, 1150, 1152 (D. Colo. 2012),

the Honorable Lewis T. Babcock found that two Colorado statutes, on which the plaintiff relied for his wrongful discharge claim, did not apply such that the statutes could not have been violated under the facts alleged. *See also Farmer v. Central Bancorporation, Inc.*, 761 P.2d 220, 221 (Colo. App. 1988) (the plaintiff admitted that he could have engaged in the allegedly "unlawful" conduct without violating the statute). Vectrus relies on these cases for its position that the regulations Cross identifies in support of his wrongful discharge claim do not apply to the facts alleged.

Cross has identified Army Regulation 381-12, DOD Directive 5240.06, and 10 U.S.C. § 802 as the public policies which support his claim. Resp to Interrogatory 11, ECF No. 129-1 at 8–9. Without rebuttal or objection from Vectrus, Cross describes these policies in his response brief as follows:

> In particular, Army Regulation 381-12, which sets forth the Military Intelligence Threat Awareness and Reporting Program and implements DOD Directive 5240.06, "provides policy and responsibilities for threat awareness and education" and establishes a requirement to report any incident of, among other things, known or suspected espionage, terrorism, sabotage, subversion, theft or diversion of military technology, information systems intrusions, and unauthorized disclosure of classified information. Army Reg. 381-12. It applies to employees of defense contractors such as Plaintiffs and its purpose is to protect against and report instances of threat, including information system intrusions and unauthorized access of classified information. *Id.* DOD Directive 5240.06, concerning Counterintelligence Awareness and Reporting, requires reporting situations wherein individuals improperly obtain or access sensitive or classified information. DOD Directive 5240.06. The Directive is applicable to civilian employees. *Id.* And, the Directive states that persons subject to the UCMJ who violate provisions of the Directive may be subject to discipl[in]e. (DOD Directive 5240.06 at Encl. 2(5)(e).) Vectrus admits that the DOD Directive "requires military and contractor employees to report certain enumerated acts which might tend to show espionage or other improper activities." (Motion No. 120, p. 17.) The UCMJ also requires reporting and applies to contractors such as Plaintiffs. Executive Order 13292 (amending Executive Order 12958), 68 Fed. Reg. 15315, provides the source for the Army Regulation and the DOD Directive and contains detailed instructions regarding protection of classified information.

Resp. 35–36. The Court finds Cross' description consistent with the content of Army Regulation

381-12[6] and DOD Directive 5240.06, copies of which are attached at ECF Nos. 129-52 and 129-53.

The Court finds that the Army regulation and DOD directive apply to Cross as an employee of a defense subcontractor, such that if he were to violate them, he might "be subject to discipline." *See, e.g.,* DOD Directive 5240.06 (stating that the purposes of the directive include "[e]stablish[ing] that civilian employees under their respective jurisdictions who violate specific provisions of this issuance may be subject to appropriate disciplinary action under regulations governing civilian employees."), ECF No. 129-53; *see also* Executive Order 13526 (revoking Executive Order 13292[7]), 75 F.R. 707, § 5.5(b) (officers and employees of the United States Government, and its contractors, shall be subject to sanctions if they violate any provision of the Order or the implementing directives). In *LaBrecque v. L3 Commc'n Titan Corp.*, No. 05-cv-00642-REB, 2007 WL 1455850,

---

[6]For example, Army Regulation 381-12, § 1-14, includes the following provision titled, "Contractors and contract management personnel":

> Contractors and contract management personnel will proceed as follows:
>
> a. Army contracting officers or contracting officer representatives will ensure that threat awareness and reporting requirements are included in future classified contracts or on DD Form 254 (Department of Defense Contract Security Classification Specification), as appropriate.
>
> b. The contracting officers or contracting officer representatives will ensure Army contractors with security clearances comply with threat awareness and reporting requirements specified by this regulation.
>
> c. Persons employed by Army contractors will report threat-related incidents, behavioral indicators, and other matters of CI interest specified in chapter 3, to the facility security officer, the nearest military CI office, the Federal Bureau of Investigation, or the Defense Security Service.

ECF No. 129-52 at 10. Vectrus contends that this regulation was never included in the BOA and, thus, it was not "applicable" to Vectrus employees. However, unlike 10 U.S.C. § 2409, the regulation does not appear to contain language stating that it applies only to contracts or subcontracts that are compliant with §1-14(a).

[7]Plaintiffs argue without rebuttal that Executive Order 13292 provided the "source" for the Army regulation and DOD directive. Resp. 42.

at *5 (D. Colo. May 16, 2007), *aff'd sub nom*, *Sydnes v. United States*, 523 F.3d 1179 (10th Cir. 2008), the Honorable Robert E. Blackburn "discern[ed] one or more genuine issues of material fact relevant to the plaintiffs' claim alleging that they were discharged by Titan in violation of public policy," where the plaintiffs alleged they were terminated by a defense contractor not long after reporting what they perceived to be a regulatory violation in providing a civilian with access to classified information. Five days after his order, Judge Blackburn "supplemented" the order "find[ing] and conclud[ing] that the rule, directive, and Executive Order at issue here are public policies that are legally sufficient bases for the plaintiffs' wrongful discharge claim under Colorado law because the rule, directive, and Executive Order meet the requirements stated in *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996)." 2007 WL 1520110, *1 (D. Colo. May 21, 2007). Judge Blackburn did not describe the "rule, directive, and Executive Order" in either of his opinions, but the Court notes the public docket in that case reveals the plaintiffs relied on an Air Force Instruction 33-211 and DOD Directive 5200.1 regarding the reporting of unauthorized access to classified information, similar to the Army regulation and DOD directive at issue in this case. *See LaBrecque*, No. 05-cv-00642-REB, ECF No. 105 at 11-12.

The Court agrees with Judge Blackburn's analysis and findings and will follow them here to conclude that Army Regulation 381-12 and DOD Directive 5240.06 "meet the requirements stated in" *Mariani*, 916 P.2d at 525 ("In limited circumstances . . . we agree with the jurisdictions that hold there may be other sources of public policy such as administrative regulations and professional ethical codes."). The Colorado Supreme Court emphasized that any non-legislative sources identified as bases for a wrongful discharge claim must "serve the interests of the public rather than the interests of the profession," "may not concern merely technical matters," and "must provide a clear mandate to act or not to act in a particular way." *Id.* Here, the Court easily concludes that

19

military regulations or directives mandating a report of unauthorized access to classified information, particularly as they are applied at a U.S. military base in a country known for training and harboring persons desiring to harm the United States, meet the requirements set forth in *Mariani*.

Moreover, the Court concludes that Colorado recognizes both state *and* federal mandates as "public policy" that properly supports a wrongful discharge claim. For example, in *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 111 (Colo. 1992), the Colorado Supreme Court recognized that a federal criminal statute mandating truthfulness and accuracy in governmental reports served as a basis for a wrongful discharge claim; in *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008), the court held that "Colorado has a clearly expressed public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's participation in defrauding the [federal or state] government"; and, in *Herrera v. San Luis R.R. Co.*, 997 P.2d 1238, 1241 (Colo. App. 1999), the court held that a complaint sufficiently alleged a wrongful discharge claim by asserting he suffered retaliation for seeking benefits under the Federal Employers' Liability Act. Although there is no case directly answering whether Colorado itself "has a public policy in the enforcement of the regulation [and] directive" at issue in this case, as Vectrus contends, the Court finds that *Mariani* does not require such showing but, rather, requires only those limitations quoted above.

Therefore, as the Court concludes that Cross has sufficiently identified public policy under the requirements of which he allegedly suffered retaliation (*see Mariani*, 916 P.2d at 524 ("The identification of the statutory or constitutional provisions that qualify as clear expressions of public policy is a matter for judicial determination.")), the Court will proceed to determine whether Cross has raised genuine issues of material fact demonstrating his conduct that was mandated by the

policies caused his termination.

B.    Causation

First, temporal proximity may be considered in determining whether Cross' protected conduct caused his termination on September 13, 2013. *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 509 (10th Cir. 2012). Even were Cross to rely solely on the alleged "July or August 2013" reports to Spann, Daniel, and military oversight officers that Brown, Fluor Security Specialist, was given access to interviews held by investigators Salazar and Hall without the military's approval, the Court finds the temporal proximity of one-and-a half to two months between the report and his termination sufficient to demonstrate a material issue of fact as to causation. *Id.* (citing cases demonstrating that a one-and-a-half-month period is sufficient to establish prima facie causation, but a three-month period, without more, is not).

Second, "Colorado law requires that an employer 'was aware, or reasonably should have been aware' that the employee's actions were legally protected." *Barlow*, 703 F.3d at 508 (quoting *Lorenz*, 823 P.2d at 109). Here, Vectrus contends that Cross fails to raise material factual issues demonstrating that the individual(s) who made Cross' termination decision knew of his protected activity.

The record reflects that Fluor officials, Brown and Keenan, conducted an investigation in July 2013 revealing that Cross first reported on July 18, 2013 that he had never used a thumb drive to retrieve classified documents from the Centrix/BATS computer system, then after Cross learned later that day that the thumb drive contained classified information, he completed a second statement asserting that he did, in fact, use a thumb drive to retrieve documents for Conklin, which included classified information, "without fully reviewing what was on it." *See* Investigation Report, ECF No. 124-1 at 7; Cross Statements, ECF No. 129-34 at 38–39. Following its investigation, Fluor

instructed Vectrus to "conduct [its] own investigation and provide [Fluor] a corrective action plan by 30 August." Tucker Email, August 21, 2013, ECF No. 124-1 at 44–45.

Vectrus' Mission Systems security specialist, Eric Schultz, conducted the investigation from August 22–28, 2013 and determined that Cross "deliberately disregarded security requirements, displayed negligence in the handling of classified information and obstructed the course of an official investigation by providing false and misleading information." On August 29, 2013, Deputy Program Manager Hobbs sent an email to Program Manager Diaz (and copied to HR Manager Riley) summarizing Schultz' report and recommending personnel corrective actions for all employees involved, including termination of employment for Cross.[8] ECF No. 124-1 at 39–43. Riley forwarded that email to HR Supervisor Doug Brown, who an hour later, sent an email back to Riley summarizing the content of Hobbs' email and including a somewhat revised list of recommended personnel corrective actions, but keeping the recommendation to terminate Cross. *Id.* 22–27. Doug Brown later explained to Vectrus Employee Relations Analyst Melanie White that Cross

> mishandled classified information and utilized an unauthorized storage device; and unlike the others, the employee obstructed an official investigation by providing false information, which was later found through a subsequent interview and inspection of his storage device. Based on the [ ] employee's department and position title, **the Project** *found these actions inexcusable and recommended termination*.

September 9, 2013 Email, ECF No. 137-1 at 18 (emphasis added).

Venola Riley, now known as Venola Scott, provided a declaration asserting that "neither [she] nor [her] HR department were involved in the investigation that ultimately led to [Cross'] termination." Declaration of Venola Scott, September 28, 2017 ("Scott Decl.") ¶ 20, ECF No. 123.

---

[8]Vectrus refers to Doug Brown as "the employee who made the recommendation that Cross be terminated." Reply 11. However, the evidence reflects that Hobbs' email containing a recommendation to terminate Cross was forwarded to Brown an hour *before* Brown sent his email containing the same recommendation. ECF No. 137-1 at 21, 38.

Further, Scott declares:

> While Mr. Brown was an HR employee of mine, his recommendations were based solely on the Fluor investigation and the Vectrus investigation (conducted by Eric Schultz) and their conclusion that Cross had initially falsely denied improperly using a "thumb" drive, but then changed his statement and admitted it.

*Id.* ¶ 26.  Scott finally attests that when her department "sent forward the request for authorization to terminate Cross, we were not (and could not have been) motivated in any way by any alleged 'whistleblowing' activity, because we were not aware of any such activity."  *Id.* ¶ 30.

To support his position that material factual issues exist concerning whether the decision makers knew about his protected activity, Cross references an August 21, 2013 email from Diaz to Scott, Hobbs, Schultz, and Maker instructing them to "corroborate in this [NISPOM] investigation and together come up with the final report and recommended actions."  ECF No. 124-1 at 44.  Cross also points to an interview of Spann two days after Hobbs and Brown emailed the findings and recommendations of the Vectrus investigation, at which Spann mentioned the investigation and stated, "Some people will get counseled including Security Investigator Lead Paul Cross, which is a surprise, but he lied about something so HR says we're doing [a final written warning]."

The record—including Hobbs' August 29, 2013 email recommending termination, Brown's September 4, 2013 email noting Cross' termination request is supported by Diaz and Scott, and Brown's September 9, 2013 email noting that "the project . . . recommended termination"—makes clear that the termination decision came initially from program management and was later confirmed by HR and Employee Relations.  *See also* September 12, 2013 Email (in referencing the findings of the NISPOM investigation, Melanie White stated that "the program . . . recommended termination.").  Thus, Cross must show factual issues as to whether Diaz and/or Hobbs knew he engaged in protected activity.

Importantly, Cross testified that he did *not* report any potential security violations to Vectrus

management other than to Spann and Daniel. The fact that Diaz instructed Hobbs and others on August 21, 2013 to work together to complete an investigation into NISPOM violations and to recommend corrective actions does not demonstrate that Vectrus management knew Cross had reported possible security violations. However, Spann's knowledge about the investigation's findings (including that Cross "lied") just two days after the recommendations were made demonstrates that Spann had discussed the findings with someone who knew them; Spann testified that person was "Venola Riley" (Scott) who purportedly told him "things were wrapping up, and that something happened with Paul Cross and Fluor was directing pretty much the punishments and that we were probably going to do a Final Written Warning on him. And that she told me I was gonna get one too." Deposition of Brandon Spann, March 20, 2017 ("Spann Dep.") 218: 13 – 219: 15. Scott testified not only that she did not speak with Spann about the investigation, but also that he lied in saying she did. Deposition of Venola Scott, May 18, 2017 ("Scott Dep.") 80: 5–16. The Court finds this dispute raises a material issue of fact as to with whom Spann discussed the NISPOM investigation[9] and as to whether Spann, to whom Cross reported potential security violations in allowing Brown access to classified information, had involvement in the investigation leading to Cross' termination.

Furthermore, Cross testified without rebuttal that Jim Brown "lied" by reporting that Cross recanted his statement to Fluor only after it was discovered that the thumb drive contained classified information, when "in reality" Cross asked to revise his statement when he remembered that he had, in fact, retrieved documents for Conklin, and Brown told him, "Oh, that's no problem. We'll just tear up the old statement. It's not a big deal." Cross Dep. 261: 1 – 262: 5.

---

[9]Cross also testified that he witnessed Spann and Brown "talk[ing] all the time" (Cross Dep. 96: 22 – 97: 5), and saw Spann, Daniel, and Brown meeting "a lot" (*id.* 162: 9–13). Cross asserted that "I've walked in and they're all three together, and as soon as I walk in, they stop talking and look at me like I was interrupting." *Id.* 162: 21–24.

Finally, Cross argues that he and Spann committed essentially the same conduct, but only he was terminated.[10] The record reflects a September 9, 2013 email from White to Doug Brown following his request for approval of Cross' termination asking Brown to "[p]lease explain why Mr. Cross was sent forward for termination but the following employees were recommended for either suspension or FWW." ECF No. 137-1 at 18–19. White listed all of the employees involved in the investigation, except Blanchard and including Spann. *Id.* Doug Brown responded that "unlike the others, [Cross] obstructed an official investigation by providing false information, which was later found through a subsequent interview and inspection of his storage device." *Id.* at 18. Cross contends that the evidence reflects Spann engaged in the same conduct, but was not terminated.

The Court is not persuaded by this final argument, primarily because the evidence reflects Cross' and Spann's conduct were not the same and they cannot be reasonably compared. For example, where the Fluor investigator initially asked Cross whether he used a thumb drive to access documents on BATS/Centrix (ECF No. 129-34 at 38), there is no indication that Spann was initially asked whether he had used a thumb drive and denied it. *See* ECF No. 137-1 at 5, 7. In addition, the evidence shows that the material Spann retrieved by thumb drive was not classified and his retrieval of the material was directed and approved by military oversight. *Id.* at 7. Conversely, the material Cross downloaded on his personal thumb drive contained classified information and he retrieved it at the request of Conklin, another security investigator. *See* ECF No. 137-1 at 16. Cross testified

---

[10]Notably, Cross references Fluor's "final report and recommendation regarding the NISPOM Investigation," but cites only to Bates numbers. *See* Resp. 18. There is no indication that a copy of such report is attached to Plaintiffs' brief or is part of the record. In addition, a copy of Plaintiffs' deposition exhibit 109, which was used in Scott's deposition and which is allegedly a statement by Spann indicating he had "forgotten" that he directed an employee to use a thumb drive to access documents from the BATS, is not attached to the briefing. The Court notes that the current record consists of thousands of pages of documents and neither party has made it "easy" for the Court to access the cited material. A district court is not obligated to comb the record to make a party's argument for him. *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

that he had been previously directed by Daniel to retrieve materials from the BATS onto his thumb drive but, again, Cross admits that the documents were not classified. The Court finds Cross fails to raise a material factual issue in this regard.[11]

In sum, the Court finds Cross raises a genuine issue of material fact as to whether Spann, to whom he reported potential violations of Army Regulation 381-12 and DOD Directive 5240.06, was involved with the investigation leading to Cross' termination and whether Jim Brown, who conducted Fluor's investigation and who was the target of Cross' reports, manipulated the findings of the investigation such that Cross' conduct was inaccurately reported.

## II. Outrageous Conduct

On March 9, 2016, the Court issued an order dismissing all of the Plaintiffs' claims for outrageous conduct except those relating to "the impairment of Cross' security clearance" and the "transfers of Walker and Wascher to dangerous forward operating bases." Order, ECF No. 35. Here, Vectrus argues Cross has not met his burden to demonstrate genuine issues of material fact demonstrating any action taken on his security clearance was "outrageous."[12]

To prove outrageous conduct under Colorado law, a plaintiff must demonstrate: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (en banc). Vectrus' actions must be

---

[11]In addition, the Court finds that Cross' email, in which he takes responsibility for the termination of his employment from Vectrus, should be considered by a jury in assessing his credibility. *See* ECF No. 129-34 at 34.

[12]The Court notes that Vectrus cites to several pages of the "DelConte Depo" that were not attached to its motion: 74–75, 83, 94, 102–104, and 114–115. *See* Mot. 17; ECF No. 129-28. However, Plaintiffs filed a copy of the entire deposition transcript for Koji Del Conte. ECF No. 158-6.

> so outrageous in character, and so extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in which the recitation of the facts
> to an average member of the community would arouse his resentment against the
> actor, and lead him to exclaim, "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v. McCarty*, 476

P.2d 753, 756 (Colo. 1970)). "Proof of the tort of outrageous conduct must consist of either an

extreme act, both in character and degree, or a pattern of conduct from which the ineluctable

conclusion is the infliction of severe mental suffering was calculated or recklessly and calculously

inflicted." *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994).

Although "the question of whether conduct is outrageous is generally one of fact to be determined

by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ

on the question." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*,

877 P.2d at 883).

David Cleary, Army industrial security specialist, who worked at BAF from October 20,

2013 to June 24, 2014, testified that Vectrus "put a derog, which is a derogatory statement, on Mr.

Cross' security clearance" that "could lead to an investigation or loss of a clearance."[13] Cleary Dep.

142: 12–25. Cleary attested that it was improper for Vectrus or Fluor to give no notification to the

military regarding the NISPOM violations and "derog" because "[w]e should have done an

investigation. And, we would have made a determination because we are the information owners

[of the IP address contained on Cross' thumb drive]." *Id.* 143: 13–22. At the time Cleary learned

of the derog, he determined that an investigation was "not warranted" because the system was not

"compromised," and the Army "sent something in" to ensure Cross would qualify if he reapplied.

---

[13]It is undisputed that the "derog" or "adverse information" was put into the Joint Personnel
Adjudication System ("JPAS"), which contains information regarding defense contract employees'
security clearances.

*Id.* 144: 16 – 145: 4.

Andrew Albright, DOD director of plans, training, mobilization, and security at BAF from March 2013 to March 2014, testified that when a "derog" is entered on a security clearance, the manager can "revoke, locally suspend, or do nothing but just report the derog," and in Cross' case, "they went straight to revoke." Albright Dep. 94: 9–20. Albright explained, "if a contractor gets . . . terminated with a revoked clearance . . . [t]hat person is now in no man's land, no person's land, until another company picks them up." *Id.* 94: 24 – 95: 5. He also confirmed that the "derog" was not reported to military oversight, but should have been. *Id.* 95: 12 – 96: 3.

Brian Wilson, Fluor senior security manager, testified that defense contractors have reporting requirements to the Defense Security Services ("DSS"), which maintains the contractors' "facility clearance" and "JPAS records," and "conducts audits on the company to ensure industrial security and NISPOM compliance." Wilson Dep. 90: 13–20. According to Wilson, NISPOM requires contractors to report adverse information regarding an employee in the JPAS on a wide variety of issues, including classified information "spills." *Id.* 93: 20 – 94: 1. He also attested that the uploading of an adverse action report into the JPAS does not revoke a person's security clearance; however, a company can revoke its sponsorship of a person's security clearance. *Id.* 93: 11–16.

The NISPOM, in effect at the time relevant to this case, required contractors "to report certain events that have an impact on the status of the facility clearance (FCL), that impact on the status of an employee's personnel security clearance (PCL), that affect proper safeguarding of classified information, or that indicate classified information has been lost or compromised." NISPOM § 1-300, ECF No. 129-30 at 26. It also required contractors to "report adverse information . . . concerning any of their cleared employees" to the "CSA" or cognizant security agency. *Id.* § 1-302(a). A report on a "culpable individual" shall contain "[a] statement of the administrative

actions taken against an employee . . . when individual responsibility for a security violation can be determined and . . . [t]he violation involved a deliberate disregard of security requirements." *Id.* § 1-304.

Vectrus argues that it was required by NISPOM to report the adverse information on Cross' record on JPAS and that Cross admits such requirement.[14] While these arguments may be true, they do not end the story. Cross contends that Vectrus did not notify the military about the adverse report, as it was "required" to do. Cross Dep. 289: 19 – 290: 2. Cleary testified that, had Vectrus reported the "derog" to military oversight, it would have conducted its own investigation as "owners" of the "classified information." Cleary Dep. 143: 13–22. But, both Wilson and Koji Del Conte (Vectrus security manager) testified, and the NISPOM states, that reports must be made only to "the CSA." *See* NISPOM § 1-302 (a) (report adverse information to CSA); Del Conte Dep. 82: 18–25 ("The cognizant security activity for a military is the customer on the military installation. Then off the military installation is the DSS."); Wilson Dep. 90: 13–20 (reporting requirement is to DSS). Cross provides nothing rebutting this requirement, nor any policy or regulation demonstrating a requirement that Vectrus report the NISPOM violation and/or adverse information to military

_____

[14]The report allegedly made on Cross' security clearance information in JPAS was:

Cross, Paul - Subject deliberately disregarded security requirements, displayed negligence in the handling of classified information and obstructed the course of an official investigation by providing false and misleading information. Subject initially claimed in a written statement that he had never copied information from a BIOMETRIC AUTOMATED TOOLSET computer or utilized a USB storage device to pass information to Conklin. During a subsequent interview and inspection of his personally owned USB storage device Cross redacted his original statement and said he had taken information from BIOMETRIC AUTOMATED TOOLSET and placed it on his personally owned USB storage device and passed it to Conklin. Cross acted with negligence when he utilized a personally owned USB storage device to download classified information from a Government owned IS.

ECF No. 129-33 at 3; *see also* 129-32. Cross admitted that Vectrus was required by NISPOM to "file a report in JPAS." Cross Dep. 289: 9–18.

oversight at the base.

Nevertheless, the Court finds that Cross has failed to raise any material factual issues demonstrating that Vectrus' "failure" to report the adverse information to military oversight is "outrageous." First, there is no documentary evidence showing Vectrus was required to do so. Second, the evidence reflects that Vectrus reported adverse information on JPAS for all employees involved in the NISPOM investigation, and there is no evidence that any failure to report this information to the military affected the other employees, including Blanchard who was also terminated. ECF No. 129-32. Third, to survive summary judgment on this claim, Cross must present evidence "that the defendant[ ] engaged in outrageous conduct with *the specific intent* of causing *severe emotional distress* or that the defendant[ ] *acted recklessly* with the knowledge that there was a substantial probability that their conduct would cause *severe emotional distress*." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994) (emphasis added). Cross testified that "as a result of his experience with Vectrus," he suffered "[a] little bit of emotional" trouble, including "[a] little bit of sleeplessness, [l]ack of trust in pretty much anybody, [and] [a] little bit of depression every now and then." Cross Dep. 313: 23 – 314: 8. Nothing in the evidence raises an issue as to whether Vectrus recklessly or specifically intended to inflict severe emotional distress on Cross by reporting the NISPOM violation on JPAS.

Accordingly, the Court finds that Plaintiffs have failed to show material factual issues demonstrating that Vectrus' conduct rises to the level of "outrageousness" (i.e., "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") necessary to overcome summary judgment. *See Martensen v. Koch*, No. 13-cv-02411-REB-CBS, 2014 WL 3057172, at *7–*8 (D. Colo. July 7, 2014) ("The level of outrageousness necessary to satisfy the first element

of the tort of intentional infliction of emotional distress is 'extremely high.' The 'defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'") (quoting *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988), *cert. denied*, 489 U.S. 1080 (1989), and *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002)).

> Conduct deemed sufficiently outrageous by Colorado courts includes allegations that a defendant Catholic priest, acting as a marriage counselor, engaged in sexual relations with a married woman who sought marriage counseling from him (*Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988)); an unlicensed psychologist reporting that plaintiff had sexually abused his children, despite significant evidence to the contrary (*Montoya ex rel. Montoya v. Bebensee*, 761 P.2d 285 (Colo. App. 1988)); and defendants who refused ambulance service to plaintiff's critically ill wife, causing her death (*DeCicco v. Trinidad Area Health Ass'n.*, 573 P.2d 559 (Colo. App. 1977)).

*Id.* at *8; *see also Christen-Loper v. Bret's Elec., LLC*, 175 F. Supp. 3d 1213, 1226 (D. Colo. 2016) (allegations that the defendant terminated the plaintiff's employment knowing she was in the hospital on suicide watch were sufficient to state plausible claim for outrageous conduct).

## CONCLUSION

Cross has failed to demonstrate genuine issues of material fact as to whether Vectrus caused him severe emotional distress and, thus, the Court will grant summary judgment on Cross' third claim for relief. However, the Court finds material factual issues exist concerning whether Vectrus retaliated against Cross by terminating him after he reported potential security violations.

THEREFORE, Defendant Vectrus Systems Corporation's Motion for Summary Judgment as to Plaintiff Paul Cross' First and Third Claims for Relief [filed October 2, 2017; ECF No. 118] is **granted in part** and **denied in part** as set forth herein. Cross' Third Claim for Relief is dismissed with prejudice.

Dated at Denver, Colorado, this 14th day of February, 2018.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge