IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02418-MEH

VICTOR CEJKA,
JAMES WALKER,
STEVEN WASCHER,
JAMIE LYTLE, and
PAUL CROSS,

       Plaintiffs,

v.

VECTRUS SYSTEMS CORPORATION, f/k/a Exelis Systems Corporation,

       Defendant.

---

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFFS JAMES WALKER'S AND STEVEN WASCHER'S FIRST AND THIRD
CLAIMS FOR RELIEF**

---

**Michael E. Hegarty, United States Magistrate Judge**.

       Plaintiffs initiated this employment action against Defendants on October 30, 2015, alleging

essentially that they suffered adverse employment actions in retaliation for reporting what they

believed to be improper conduct affecting security at Bagram Air Force Base in Afghanistan.

Plaintiffs allege claims against their former employer, Defendant Vectrus Systems Corp.

("Vectrus"), for common law retaliatory termination (Claim I); violation of 10 U.S.C. § 2409, the

Department of Defense whistleblower statute (Claim II); and common law outrageous conduct

(Claim III).[1] Here, Vectrus seeks summary judgment in its favor on Plaintiffs James Walker's

("Walker") and Steven Wascher's ("Wascher") first and third claims for relief. In addition, the

Court will analyze James Walker's second claim for relief in this order. The Court finds Walker and

---

       [1]Claim III was limited in scope by the Court's March 9, 2016 order granting in part
Defendants' motion to dismiss. *See* ECF No. 35.

Wascher raise genuine issues of material fact regarding their first claims for relief and Walker raises material issues of fact concerning his second claim for relief, but the Plaintiffs fail to demonstrate factual issues regarding their third claims for outrageous conduct. Accordingly, the Court grants in part and denies in part Vectrus' motion.

## **FINDINGS OF FACT**

The Court makes the following findings of fact viewed in the light most favorable to Walker and Wascher, who are the non-moving parties in this matter.[2]

1.     On June 27, 2007, Fluor Corporation ("Fluor") entered into contract number W52P1J-07-D-0008 (the "Prime Contract") with the U.S. Department of the Army to provide services to the Logistics Civilian Augmentation Program ("LOGCAP") in Afghanistan.

2.     Vectrus, previously known as Exelis Systems Corporation and ITT Systems Corporation, is a Delaware corporation, with its principal place of business in Colorado Springs, Colorado.

3.     On June 20, 2008, Vectrus entered into a subcontract with Fluor, titled "Blanket Ordering Agreement," to provide support for the LOGCAP program in Afghanistan (the "BOA").

4.     Plaintiffs James Walker and Steven Wascher were hired by Vectrus effective January 7, 2013 as security investigators (or, "screeners") on the LOGCAP program. Deposition of James Walker, February 9, 2017 ("Walker Dep.") 40: 3–9; Deposition of Steven Wascher, January 23, 2017 ("Wascher Dep.") 25: 21 – 26: 4.

5.     At Vectrus, Walker and Wascher, along with other security investigators including the Plaintiffs, worked at Bagram Air Force Base ("BAF") in Afghanistan in a Force Protection Screening Cell ("FPSC")[3] and reported to Brandon Spann ("Spann"), senior security supervisor, who

---

[2]Unless cited, these facts are undisputed by the parties.

[3]The "cell" was also known as "ECP-1," or Entry Control Point 1, which was the primary foot traffic gate for BAF. Approximately 6,500 to 7,300 persons would pass through the gate on a

reported to Kevin Daniel ("Daniel"), regional mManager, who reported to Richard Diaz, program manager.

6.    While the screening cell was supervised by Spann, Walker and Wascher also reported to the military oversight officer, Sergeant First Class John Salinas ("SFC Salinas").[4] Deposition of Victor Cejka, January 26, 2017 ("Cejka Dep.") 121: 15–21.

7.    The security investigators, including Walker and Wascher, conducted interviews and investigations required for the issuance of access badges to over 6,500 non-military personnel for daily entry to the military base. Investigators prepared investigation reports (known as "dossiers") which, along with fingerprints, iris scans, and facial photos, were entered into the Biometric Automated Toolset System computer database ("BATS"), a security database maintained by the Department of Defense ("DOD") and shared with the United States' NATO allies. Answer ¶ 30, ECF No. 104; Deposition of Andrew Albright, Dec. 21, 2016 ("Albright Dep.") 19: 11–25; 22: 5 – 24: 4.

8.    The maintenance of accurate information in BATS was vital to the security of the base and the military's other bases throughout the world. *Id.* 26: 2–13; 27: 2–19.

9.    The dossiers summarized the security investigations and recommendations for access to the base (as well as other privileges such as access to laptops, cell phones, or even in some instances weapons), but only the military was authorized to issue access badges. Cejka Dep. 109: 23 – 110: 16.

10.    While Wascher was initially assigned to BAF, he was shortly thereafter transferred to forward operating base ("FOB") Sharana. He had "no objections" to the transfer, because "it was

_____

daily basis. Deposition of David Cleary, Dec. 1, 2016 ("Cleary Dep.") 27: 22 – 28: 4.

[4]SFC Salinas was the military oversight officer at the FPSC during most relevant times in this case; however, at other relevant times, James Fox was the military oversight officer.

where the company needed [him] to go." Wascher Dep. 54: 16 – 55: 5.

11.     In April 2013, Fluor issued a "call form" directing the descope of security investigator positions at FOB Sharana and, as a result, Wascher's position was eliminated. Vectrus offered him the position of biometric clerk at Camp Spann, a satellite camp at FOB Marmol, which Wascher acknowledged was a "demotion" that paid about $30,000 per year less than his prior position, but he accepted it and had no objection because "at the time, I didn't feel it was anything personal. It was the needs of the company." Wascher Dep. 56: 3 – 58: 20. In addition, Wascher's supervisors promised him that, if he took the position, "as soon as another investigator position comes open, you know, we'll make sure you get that spot." *Id.* 58: 21–25.

12.     On June 3, 2013, a security investigator position opened up at BAF; Wascher was promoted to the position and transferred back. Wascher Dep. 62: 3 – 63: 4.

13.     In or about the summer 2013, Walker observed that another security investigator, Marc Salazar, accessed the BATS using the name and account of a military oversight official, Sergeant Shahan, without her permission. Walker Dep. 203: 13 – 205: 8. Walker asked Sergeant Shahan whether she had placed "alerts" on certain people entering the screening cell, who were noted to meet with Salazar, and she said, "no." *Id.* 205: 4–25. Walker reported this to military oversight Sergeant Shahan and SFC Salinas. *Id.*

14.     Wascher also witnessed Salazar using Sergeant Shahan's name and account to access the BATS system to place alerts on certain people without Shahan's permission, and he reported it to Tom Robin. Wascher Dep. 165: 21 – 167: 22.

15.     In or about August 2013, Wascher was asked to conduct an investigation of a person suspected of possessing a cell phone, which was not allowed on base absent military approval. Wascher Dep. 107: 8 – 108: 10. Wascher interviewed the suspect and, during a break, Daniel

approached Wascher and told him that he "knew for a fact" that "she does have a cell phone" because either "Agron or Artan [Fana] gave her the phone" to arrange "meetings" with her during lunch or in the evenings. *Id.* 110: 17 – 111: 13; 139: 17–19.

16.     Immediately following the interview with the suspect, Wascher completed a dossier on the BATS, in which he included the information Daniel reported to him. *Id.* 111: 20–25, 112: 1.

17.     Walker was also asked to conduct an interview of a third country national in relation to the same incident and he prepared a dossier on the BATS. Walker Dep. 192: 19 – 193: 21.

18.     The next morning, Plaintiff Lytle told Wascher that Conklin had approached him saying that someone had deleted information from Wascher's reports. Wascher Dep. 112: 15 – 113: 6. That "someone" according to Conklin was Shajaida Rivera, biometrics clerk, who allegedly deleted information at Spann's request. *Id.* 101: 14–23.

19.     Wascher reviewed the previous day's report and discovered that the information Daniel had given him was missing. *Id.* 114: 4–12.

20.     That same day, Specialist Siewell entered Walker's office, closed his door, and told Walker to check on his report from the previous day; Walker saw that several paragraphs of his dossier on BATS concerning Artan Fana and Agron Fana were missing. Walker Dep. 194: 8 – 195: 9. Walker replaced the altered dossier with a complete copy he had saved and reported the alteration to his supervisor, Tom Robin. *Id.* 197: 17 – 198: 7.

21.     Wascher reported the information missing from his report to his "lead," Plaintiff Cross, who told him to put the information back into the report, file it, and save a copy of the report. Wascher Dep. 114: 13–22. Wascher did so, then sent an email to Cross, Robin, Spann, and Daniel "informing them of the deletion of details in [his] report, [and] asked them if they could provide an explanation and what . . . steps would be taken to rectify it." *Id.* 115: 4–11. Only Cross responded to the email

saying he would speak to Spann about the matter, but Wascher had no knowledge whether Cross ever did. *Id.* 116: 14–24.

22.     The next day, Wascher sent a second "exact same" email "to ensure that everyone was receiving the email." *Id.* 116: 1–3. That morning, in the daily security meeting, the investigators "discussed reports being altered" in a general sense and that "everyone should double check their reports when they're filed to make sure everything's right, in case there's any alterations." *Id.* 119: 3–19.

23.     Later that day, Wascher and Cross were called to Spann's office, in which Daniel was also present, and Spann "yelled" at Cross asking whether Cross was "telling people that reports had been altered." *Id.* 117: 6–21. When Cross answered that he was "checking to see what was going on," Spann told him to "never bring it up, never talk about it, drop the subject immediately." *Id.* 117: 22 – 118: 2.

24.     At some point thereafter, Wascher was called to a meeting with Spann and Daniel at which Spann asked Wascher whether he "was providing statements to the military." *Id.* 46: 2 – 48: 4. Wascher testified he told Spann and Daniel that Salinas was conducting an investigation into the alterations of the reports and Spann ordered Wascher not to cooperate, but when Wascher stated it would be illegal not to cooperate, Spann "changed his tone and stated that what he meant to say was that he would go with me to the meeting and – and help me if I needed it." *Id.* 48: 5 – 49: 7.

25.     Wascher states that he did not report the alterations to the military; rather, Specialist Siewell approached Wascher two to three days later saying there was going to be an investigation concerning the alterations. *Id.* 120: 11 – 121: 21. Wascher later learned that it was likely Conklin who informed Siewell that she suspected Rivera had altered the reports. *Id.* 123: 13–19.

26.     Wascher and Walker also learned later from Specialist Siewell that the deletions, in fact,

occurred at Rivera's computer terminal. *Id.* 133: 5–17; Walker Dep. 200: 20 – 202: 8.

27.    SFC Salinas first testified at his deposition that both Cross and Wascher brought the alterations to his attention in or about August 2013. Salinas Dep. 43: 9–15; 54: 15 – 55: 13. He testified later, however, that Wascher reported the problem to him verbally with no one else present. *Id.* at 167: 10–14; 168: 17 – 169: 3. Salinas "consider[ed] this to be a serious matter" due to the nature of the BATS system, and he reported it to Andrew Albright, DOD director of plans, training, mobilization, and security at BAF, and Sergeant Major Bianco, the garrison commander. *Id.* 55:14 – 56: 20.

28.    Thereafter, the Air Force OSI (office of special investigations) and Army CID (criminal investigation command) interviewed the Plaintiffs and "took over" an investigation. Deposition of SFC John Salinas, November 30, 2016 ("Salinas Dep.") 55: 4 – 57: 1. Salinas was authorized by Garrison Command to monitor the situation and instructed the security investigators, including Walker and Wascher, to meet with him periodically if they observed or experienced "anything out of the ordinary, anything that wasn't policy." *Id.* 57: 7 – 58: 10.

29.    Wascher also testified that he discussed the deletions of his report with the "Air Force OSI, United States Army Counter-Intelligence, task force biometrics, Garrison Commander Albright, Garrison Sergeant Major Bianco, and the BAF JAG office." Wascher Dep. 136: 24 – 137: 8. He told these officials that he believed Rivera deleted the information at the request of Spann, with whom she was having a sexual relationship and who was trying to help his friend, Daniel, who regretted giving the information to Wascher. *Id.* 139: 9 – 142: 13.

30.    While he was at BAF, Wascher was approached by Sergeant Shahan and asked to conduct an interview of two men who had access to the base through "common access cards" usually provided only to United States citizens. Wascher Dep. 238: 18 – 239: 7. Wascher brought up the

dossiers of the men on the BATS system, but found very little information input by his fellow security investigator, Salazar. *Id.* 239: 7–24. Wascher never interviewed the men because, while he was preparing to start the interviews, Spann burst into his office yelling, "What business do you think you have interviewing these people?" *Id.* 241: 24 – 242: 20. Wascher reported this incident to the military agencies on base. *Id.* 243: 20 – 244: 12.

31.     Walker testified that Spann and Daniel authorized James Brown, Fluor security manager, to attend "two or three" of his interviews. Walker Dep. 233: 15 – 234: 6. Both Walker and Wascher witnessed Brown attend interviews by other security investigators, including Salazar, Lytle, and Ed Sapp. *Id.* 234: 7–12; Wascher Dep. 258: 12 – 259:16, 263: 4–17. They reported this conduct to Cross and SFC Salinas. Walker Dep. 234: 19–25; Wascher Dep. 262: 3–10. Wascher testified that some of the interviews related to reports of Fluor security violations and, thus, it was improper for Brown to participate in the interviews. Wascher Dep. 262: 19 – 263: 10.

32.     Wascher observed Fana, Vectrus database administrator, bring uncleared foreign females into the biometrics room, which was the most secure room in the building; he heard them have sex in the room, then saw them leave the room putting their clothes back on. Wascher Dep. 163: 8–20; 170: 1 – 172: 7. Wascher reported this conduct to Robin and to the military. *Id.*

33.     Walker reported to his supervisors at Vectrus and to military oversight that Spann and Daniel kept at least two interpreters on staff, although they were not qualified, because the interpreters would do "favors," such as "get them things at the bazaar at cut rate or get them alcohol." Walker Dep. 215: 21– 221: 25.

34.     Wascher reported to Robin and to the military that Spann ordered him and the other screeners repeatedly to use either someone else's information or a generic account number to access the BAT system; Wascher believed such access constituted a violation of the National Industrial Security

Program Manual ("NISPOM").  Wascher Dep. 187: 20 – 188: 24.

35.     Spann testified that in early October 2013, he knew that Wascher, Lytle, and Walker were having secret meetings with SFC Salinas, counterintelligence personnel, and the Army CID. Deposition of Brandon Spann, March 20, 2017 ("Spann Dep.") 306: 4 – 308: 7.

36.     Spann believed that Wascher, Lytle, Cejka, and Walker were the "worst offenders" of a directive he gave that the screening cell personnel were required to have a Vectrus HR representative present when reporting wrongdoing to military agencies other than military oversight. *Id.* 295: 17 – 299: 4.

37.     Program Manager Diaz testified that Vectrus employees were not required to report any wrongdoing they observed or experienced "up the chain of command," meaning to their supervisors or next-level managers.  Deposition of Richard Diaz, February 15, 2017 ("Diaz Dep.") 112: 9 – 113: 20.  Diaz disagreed that Vectrus personnel at the screening cell were required to notify Spann or HR before providing information or statements to the military.  131: 22 – 132: 22.

38.     Based on the Plaintiffs' reports to the military, David Cleary, Army supervisory intelligence security specialist, conducted a "15-6," or "military" investigation.  Cleary Dep. 38: 15 – 40: 4.  SFC Salinas was "the person [who] would identify something that needed a deeper look. And [Cleary] was the person [who] would take the deeper look."  *Id.* 59: 12–25.

39.     On October 12, 2013 and October 19, 2013, Riley/Scott sent emails to multiple Vectrus employees including Diaz, Doug Brown, HR supervisor, Michael Hobbs, deputy program manager, and Larry Maker, operations manager, listing seven positions at BAF to be "RIF'd"; four were vacant positions, one position was held by an employee who was to be "removed," and the other two positions were held by Walker and Wascher who were to be "transferred."  ECF Nos. 123-11, 123-13.

40.     On October 18, 2013, a meeting was held at the Garrison headquarters among Salinas, Walker, Wascher, Lytle, Cejka, Andrew Albright, DOD director of plans, training, mobilization, and security at BAF, Sergeant Major Paul Bianco, garrison commander, and possibly Major Bradley Cowan from JAG.  *Id.* 79: 15 – 80: 5.  At the meeting, Walker, Wascher, Lytle, and Cejka summarized information they had provided previously to Salinas and answered questions from Albright and Bianco.  *Id.* 82: 12–23; Wascher Dep. 300: 1–13.  According to Wascher, "[t]hey were trying to vet [sic] us to make sure that we were reliable people. It was the first time they had personally met us."  *Id.* 304: 2–6.

41.     Walker learned on or about October 22, 2013 that Vectrus was going to transfer him to FOB Shank.  Walker Dep. 43: 9–20; 71: 19– 72: 17.  Walker and Wascher both testified that approximately two weeks earlier at a morning briefing, Spann and/or Daniel asked for volunteers to transfer to other FOBs and Ed Sapp and Kenneth Glover raised their hands.  *Id.* 68: 12 – 69: 11; Wascher Dep. 66: 2–21.  However, Glover testified that he did not volunteer to leave BAF, at which he had just arrived.  Deposition of Kenneth Glover, May 8, 2017 ("Glover Dep.") 41: 1–11; 62: 2–8.

42.     On October 22, 2013, Walker emailed Donald Askew, Employee Relations analyst, a complaint alleging the decision to transfer Walker to FOB Shank was based on "retaliation." Deposition of Donald Askew, February 24, 2017, Vol. I ("Askew Dep.") 58: 10 – 59: 19.  That is, Walker believed he was being transferred after having filed an HR complaint against Robert Redd. Walker Dep. 73: 3 – 74: 21.  He also had an "underlying feeling that it might have been leaked out that we were talking with the military but nothing concrete at that time."  *Id.* 86: 5–11.

43.     Askew testified that although "there was no official notification from the government," the employees at BAF felt or had a "general suspicion" that FOBs Shank and Marmol were going to close.  Askew Dep. 64: 17 – 65: 20.

44.    Tom Robin, screening cell supervisor, told Walker that Spann and Daniel told him Walker and Wascher were selected for transfer because they were "troublemakers."  Walker Dep. 100:14 – 101: 16.

45.    Robin had told Wascher "four or five times" something to the effect that, " I don't know what you did to [Daniel] but he says, 'if Wascher's smart he'll find another job or get out of Bagram before I find a way to get rid of him.'" Wascher Dep. 63: 18 – 64: 24.

46.    Askew opened an inquiry into Walker's complaint, interviewed (1) Walker, (2) Daniel, (3) HR manager Riley/Scott, and (4) a Fluor security manager, and determined that no investigation needed to be conducted.  *Id.* 59: 20 – 60: 2; 61: 18 – 64: 1; 66: 4–23.

47.    Walker was transferred to FOB Shank on October 25, 2013.  Walker Dep. 67: 10–16.

48.    FOB Shank was "among the most dangerous [FOBs] in Afghanistan. [It] was attacked by direct and indirect fire nearly every day, often more than once per day. These attacks often resulted in casualties. A number of employees quit their jobs rather than be stationed at Shank."  Declaration of Kelly Harris, January 6, 2017 ("Harris Decl."), ¶ 2, ECF No. 158-28.

49.    Wascher was transferred to FOB Marmol on October 29, 2013.  Wascher Dep. 63: 5–9.

50.    During the early morning of November 5, 2013, members of the United States military at BAF arrested eight employees of Vectrus and barred them from the BAF – Kevin Daniel, Brandon Spann, Carl Lynch, Marc Salazar, Robert Redd, Artan Fana, Agron Fana, and Shajaida Rivera – on suspicion of drug and alcohol possession, fraternization, espionage, fraud, waste, abuse, and threats to the integrity of the BATS system.  Salinas Dep. 88: 5 – 91: 25; Cleary Dep. 72: 12 – 73: 17.

51.    Prior to the raid, Walker told no one at Vectrus that he was cooperating with the military. Walker Dep. 58: 3 – 59: 13.

52.    Cleary believed that the information found during the raid validated the information brought

to the military's attention by the Plaintiffs.  Cleary Dep. 87: 3–7.

53.	At Diaz' request, Askew and Riley/Scott escorted the eight debarred employees from Bagram to Dubai on November 6, 2013.  Askew Dep. 90: 14-20; Diaz Dep. 97: 8 – 98: 4.

54.	The debarred employees provided written statements to Askew and Riley/Scott on November 6, 2013.  For example, Spann wrote, "I feel that this was an orchestrated strike against me and the other 7 people involved by CI, SFC Salinas, Jaime Lytle, Steve Wascher, James Walker, Victor Cejka, John White, & Carson Puckett."  ECF No. 159-16 at 8.  Likewise, Marc Salazar wrote, "This incident appeared to have been orchestrated [sic] by Sgt. Salinas, Jamie Lytle, James Walker, Victor Cjeka [sic] & Steve Wascher."  ECF No. 159-19 at 7.  Also, Carl Lynch wrote, ". . . I seen [sic] Jamie Lytle, John White, Victor Cjeka, and Steve Washer [sic] sitting down talking to SFC Salanis [sic]. When I walked over to the table they all became quiet and I just walked away. . . . I briefed Brandon on all that took place while he was on R&R."  ECF No. 159-17 at 3.

55.	Askew testified that he did not read the statements, but understood they would go to Diaz, who would then forward the statements to "legal."  Askew Dep. 92: 6 – 93: 3.

56.	SFC Salinas testified that, after the raid, he attended meetings at which Diaz, Maker, and Askew were present, along with "Garrison Command" personnel, Mr. Albright, Sergeant Major Bianco, and Major Cowan.  Salinas Dep. 99: 9–22.  According to Salinas, Diaz, Maker, and Askew "took the part of [Vectrus] with the personnel that we had barred, [saying] that there was just a conflict of personalities between the people that we had barred and the screeners that had come forward with information."  *Id.* 100: 18 – 101: 1.  In addition, Salinas stated that Vectrus management "wanted to know . . . who was coming forward and alleging that the BATS system had been compromised, I guess."  *Id.* 101: 21 – 102: 12.  Salinas responded that he was not in a position to say anything during the investigation.  *Id.*

57.     Franklin Kopecky, Vectrus BAF operations coordinator, testified that after the arrests, his boss, Ruben Feliciano, BAF operations manager, told Kopecky "they were going to, you know, find the people that . . . ratted, snitched" on those who had been arrested.  Deposition of Franklin Kopecky, January 19, 2017 ("Kopecky Dep.") 30: 17 – 31: 9 ("people like Ruben and the program management, they – they knew [somebody 'dimed' them out]. And so they were . . . pretty upset by that.").  According to Kopecky, Vectrus program managers, including Askew, Maker, and Mike Schneider, used the terms, "mole, rat, and narc" to describe the people who informed the military about perceived wrongdoing at the screening cell.  *Id.* 33: 10–25.

58.     Kopecky observed that the "main person . . . that [sic] was clearly in charge of [Vectrus'] response" to the raid was Askew.  *Id.* 35: 13 – 36: 4.  Askew told Kopecky that "he was going to recommend termination based off of violation of the Code of Conduct for not using – not using the chain of command or something like that."  *Id.* 36: 5–11.

59.     In a meeting on or about November 6, 2013, Hobbs told Maker, Diaz, and Schneider that he learned during a "sensing session" with screening cell personnel that Lytle, Wascher, Walker, and [Carson] Puckett [security investigator] were "the people that went to the military."  Maker Dep. 135: 12 – 136: 10.

60.     Maker also heard directly from Lytle during a meeting on or about November 8, 2013 that he and the other Plaintiffs "were working for the military now" and "were a part of the investigation"; also, Lytle stated "they were under the military's protection."  *Id.* 156: 24 – 157: 22; 191: 4-14.  Maker communicated this information to Diaz.  *Id.* 192: 13–21.

61.     Maker believed that the "chain of command, Bagram operations manager and program manager, should have been notified as to any unethical conduct or criminal violations" in accordance with Vectrus' code of conduct.  *Id.* 178: 22 – 179: 19.  Maker told Lytle that "the PM [Diaz] is

disappointed that the chain of command was not given a chance to address these issues." *Id.* 164: 1–6.

62.     Following the raid, the screening cell was short-handed; Cleary "pleaded" with Vectrus to bring in experienced personnel. Cleary Dep. 152: 1–8. The one time Cleary asked about bringing Walker and Wascher back to BAF, he was told "they were needed where they're at." *Id.* 153: 3–9. Cleary responded, "I was like, 'we're the biggest base with the most traffic. We need personnel here.'" *Id.* 153: 10–12.

63.     Maker recalls that Cleary stated his belief to Maker and Diaz that Wascher would be a good replacement for Daniel; Diaz responded, "that's a company decision and we will go through our hiring process and make a decision on the appropriate person." Maker Dep. 213: 1–14.

64.     Askew returned from Dubai to BAF "probably" on November 8, 2013. *Id.* 147: 14–23.

65.     On November 9, 2013 and at Diaz' request, Askew "coordinated" and met with Willie Hernandez at CID and with the military JAG to discuss the allegations giving rise to the November 5th arrests. *Id.* 93: 4 – 94: 17. According to Askew, his conversation with Hernandez did not include who had cooperated with the military in providing information leading to the arrests. *Id.*

66.     In 2014, Walker reported to Tom Robin (who also had been transferred to FOB Shank) and SFC Salinas that a prostitution ring was "running out of the barber shop [at FOB Shank] that some of the firemen were interacting with" (Walker Dep. 145: 13 – 147: 17); that a Vectrus interpreter was selling blank letters of authorization "to move things in and out of the base" (*id.* 150: 2 – 152: 6); that Hindi bus drivers employed by another contractor were driving with forged drivers licenses (*id.* 152: 18 – 154: 16); that 30 Hindis were exposed to "human trafficking" in the form of "being mistreated, weren't allowed to take bathroom breaks, weren't allowed to eat, were being told they had to work extra hours" (*id.* 154: 25 – 156:16); and that a Vectrus screener "plugged in a secure

phone into a[n unsecured] Fluor computer line" (*id.* 156: 24 – 158: 25).

67.    In the spring 2014, Kelly Harris was present at a meeting at FOB Shank at which Walker was also present and Askew presided.  Harris Decl. ¶ 3.  Askew reported to the entire screening cell that Vectrus was "downsizing" and it "needed investigators at [BAF] and sought volunteers to transfer from Shank to BAF."  *Id.*  Walker was the only investigator who raised his hand and verbally volunteered to transfer to BAF; Askew did not respond.  *Id.* ¶ 4.  After the meeting, Askew approached Harris in his office and asked him whether he would agree to transfer to BAF; Harris declined and encouraged Askew to speak to Walker since Harris knew Walker wanted to transfer. *Id.* ¶ 5.

68.    After he was transferred to FOB Marmol, Wascher reported to his site lead, Jack Lee, and to SFC Salinas that John Yelder, Vectrus security supervisor, instructed screening cell employees not to cooperate with the industrial security investigator, who administered "tests to routinely verify our clearances and – and our security stuff on the computer."  Wascher Dep. 87: 21 – 90: 10.  When Yelder was "caught, he had them shred the paperwork to get rid of the evidence that he did it."  *Id.* In addition, Wascher reported to Lee and Eric Schultz that Yelder ordered him and the other screeners repeatedly to use either someone else's information or a generic account number to access the BAT system.  *Id.* 196: 13 – 198: 7.

69.    In or about May 2014, Wascher asked to meet with Askew, who had traveled to Camp John Pratt on FOB Marmol, but Askew (through Yelder, who made several requests) refused saying he did not have time to meet with Wascher.  Wascher Dep. 319: 15 – 320: 20.  Wascher wanted to discuss with Askew Vectrus' "attempt[ ] to give [him] a dissatisfactory demobilization to remove [him] from his job."  *Id.*  Wascher eventually spoke to Askew, who "resolved the situation" (i.e., Vectrus' characterization of Wascher as an "unsatisfactory employee").  *Id.* 403: 9 – 405: 24.

70.     Also in May 2014, Michael Zink, who was a supervisor and senior supervisor with Vectrus at BAF starting in January 2014, attended a meeting with Askew, who was then Vectrus' regional manager. Declaration of Michael Zink, February 7, 2017 ("Zink Decl.") ¶¶ 4, 5, ECF No. 158-29. Vectrus was reducing positions at FOB Marmol and considering which employees should be transferred to other locations, including BAF. *Id.* Zink believed that Wascher was a "strong" investigator, so suggested to Askew that he "would like to see [Wascher] among those transferred back to Bagram." *Id.* ¶ 6. Askew refused saying that "Wascher and Jamie Lytle had tried to take the company down," Askew "did not trust Wascher who he referred to as a 'snake in the grass,'" and "if [Zink] had the information that Askew knew from his prior position in Employee Relations, [Zink] would not trust Wascher and would not want him at Bagram." *Id.* ¶¶ 7, 8.

71.     About a month before Wascher was terminated from employment, Yelder told Wascher that, "he was briefed by Daniel and Spann that [Wascher] was a troublemaker and to watch out for [him]," but Yelder decided, "you're not like that at all." *Id.* 89: 6–19.

72.     Wascher was terminated from employment with Vectrus effective June 1, 2014 after declining a demotion to a biometric processing clerk during a reduction in force. ECF No. 129-46.

73.     Walker was terminated from employment with Vectrus effective July 10, 2014 after declining a demotion to a biometric processing clerk during a reduction in force. ECF No. 129-45; Walker Dep. 256: 4–6. Walker recalls that an HR representative had previously explained seniority as "last guy in is first guy out" (*id.* 251:13–23) and, as such, he should not have been selected for termination at FOB Shank. *Id.* 256: 7–20.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant

summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence

must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

At this stage of the litigation, the claims alleged by Walker and Wascher include (1) wrongful discharge in violation of public policy; (2) a violation of 10 U.S.C. § 2409 (Walker only); and (3) outrageous conduct in the form of "transferring Walker and Wascher to dangerous forward operating bases." Vectrus contends that Plaintiffs fail to raise genuine issues of material facts as to each of these claims.

## I.     Wrongful Discharge in Violation of Public Policy

"To avoid summary judgment on his claim of wrongful discharge in violation of public policy," a plaintiff is "required to adduce sufficient evidence to create a genuine issue of material fact on each element of the tort." *Mowry v. United Parcel Serv., Inc.*, 280 F. App'x 702, 707 (10th Cir. May 29, 2008) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). A plaintiff makes a prima facie case of wrongful discharge against public policy by presenting evidence:

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited him from performing a public duty or exercising an important job-related right or privilege; [2] that the action directed by the employer would violate a specific statute on the public health, safety or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or his right or privilege as a worker. The plaintiff must also show [3] that the employee was terminated as the result of refusing to perform the act directed by the employer, and [4] that the employer was aware or

reasonably should have been aware that the employee's refusal to comply with the employer's order was based on the employee's reasonable belief that the action ordered was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employees legal right or privilege as a worker.

*Barlow v. C.R. England, Inc.*, 703 F.3d 497, 507 (10th Cir. 2012) (citing *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1235 (10th Cir. 1997) and *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992) (en banc)).  In the context of a "whistleblower" action such as that alleged here, the elements of the claim are:

> (1)     the plaintiff was employed by the defendant;
>
> (2)     the defendant discharged the plaintiff; and
>
> (3)(a)   the discharge was in retaliation for exercising a job-related right or performing a specific statutory duty, or
>
> (3)(b)   the discharge would undermine a clearly expressed public policy.

*Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008) (citing *Lorenz*, 823 P.2d at 109 and *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1373 (Colo. App. 1989)).  "[U]nder the third prong, in order to survive summary judgment, a plaintiff must 'present evidence that [his] termination was causally connected to [his exercise of a job-related right or performance of a statutory duty].'" *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1256 (D. Colo. 2012). "Additionally, the plaintiff must allege that the 'public policy invoked truly impacts the public in order to justify interference into an employer's business decisions.'" *Mullin v. Hyatt Residential Grp., Inc.*, 82 F. Supp.3d 1248, 1252 (D. Colo. 2015) (quoting *Kearl*, 205 P.3d at 499).

Vectrus does not dispute that Walker and Wascher have satisfied the first two prongs of a wrongful discharge claim.  Reply 3.  Vectrus argues instead that the statutes/regulations under which Walker and Wascher reported alleged unlawful conduct did not apply to the Plaintiffs and/or did not further Colorado's public policy, and Walker and Wascher have failed to state genuine issues of

material fact demonstrating causation. Walker and Wascher counter that the statutes/regulations on which they base their claims are sufficient under Colorado law and that their terminations were in retaliation for their reports to the military of improper and illegal conduct by Vectrus management.

A. Public Policy

The Court incorporates here its analysis and conclusion from its Order on the Defendant's Motion for Summary Judgment as to Plaintiff Paul Cross's First and Third Claims for Relief, finding that Army Regulation 381-12 and DOD Directive 5240.06 "meet the requirements stated in" *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996) ("In limited circumstances . . . we agree with the jurisdictions that hold there may be other sources of public policy such as administrative regulations and professional ethical codes."). In addition, here, the military investigator, David Cleary, testified that his findings and the raid validated the information brought to the military by the Plaintiffs, including improper access to the screening cell and into the BATS system. *See Kearl*, 205 P.3d at 499 ("[t]here is no question that the manifest public policy of this state is that neither an employer nor an employee should be permitted to knowingly perpetrate a fraud or deception on the federal or state government.") (quoting *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992)).

Therefore, as the Court concludes that Wascher and Walker have sufficiently identified public policy under the requirements of which they allegedly suffered retaliation (*see Mariani*, 916 P.2d at 524 ("The identification of the statutory or constitutional provisions that qualify as clear expressions of public policy is a matter for judicial determination.")), the Court will proceed to determine whether Walker and Wascher have raised genuine issues of material fact demonstrating their conduct that was mandated by the policies caused their terminations.

B.     Causation

First, temporal proximity may be considered in determining whether Walker's and Wascher's protected conduct caused their terminations.  *See Barlow*, 703 F.3d at 509.  The testimony reflects that Walker and Wascher were instructed by the military to reveal to no one at Vectrus they were reporting what they believed to be security violations during the fall 2013, but the evidence reflects that *after* the November 5, 2013 raid, certain Vectrus personnel, including Diaz, Maker, Hobbs, and Askew learned that Walker and Wascher were some of the employees from the screening cell working with the military.  *See, e.g.,* Maker Dep. 135: 12 – 136: 10 (Hobbs told Maker, Diaz, and Schneider that he learned during a "sensing session" with screening cell personnel that Plaintiffs were "the people that went to the military.").  However, unlike their co-Plaintiffs, Cejka and Lytle, Walker and Wascher were terminated from employment with Vectrus *several* months after Vectrus management allegedly learned they had been cooperating with the military.  *Id.* (citing cases demonstrating that a one-and-a-half-month period is sufficient to establish prima facie causation, but a three-month period, without more, is not).  Therefore, temporal proximity, by itself, does not demonstrate causation for Walker's and Wascher's wrongful discharge claims.

"If sufficient temporal proximity cannot be shown, the employee must come forward with some additional evidence from which the factfinder could infer some causal relationship between the two events."  *Felix v. City & Cnty. of Denver*, 729 F. Supp. 2d 1243, 1254 (D. Colo. 2010) (citing *Haynes v. Level 3 Commc'ns Inc.*, 456 F.3d 1215, 1228 (10th Cir. 2006)).  That is,

> [t]o survive summary judgment, [plaintiff] had to present 'additional evidence' tying the adverse employment actions to [plaintiff's] participation in the [protected activity]. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 [ ] (1981). The Supreme Court has likened this burden to a showing of "but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, -- U.S. --, 133 S. Ct. 2517, 2533 [ ](2013). The evidence of but-for causation "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

*Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014).

As set forth above, Walker and Washer were transferred in late October 2013. Plaintiffs' evidence reflects that Spann and Daniel considered Walker and Wascher to be "troublemakers" including that they were the "worst offenders" of Spann's directive not to meet with the military or government officials without a Vectrus supervisor or HR official present. In addition, Spann admitted knowing in early October 2013 that Walker and Wascher were having "secret meetings with the military." Walker and Wascher testified that two weeks before they were transferred, Daniel announced a meeting of the security investigators, then asked for two volunteers to transfer to FOBs Shank and Marmol; Sapp and, possibly, Glover raised their hands. Nevertheless, Vectrus chose Walker and Wascher to be transferred to the FOBs in October at a time when Askew admits BAF personnel suspected that the FOBs were going to close.

Vectrus contends that Riley/Scott made the decision to transfer Walker and Wascher based solely on seniority; however, Askew specifically asked Daniel in an email whether it was *his* decision to transfer Walker to FOB Shank; Daniel answered, *inter alia*, that he and Spann had discussed it. Askew Dep. 61: 18 – 62: 19. The Court finds this raises a question of fact as to whether Spann and Daniel were involved in the decision-making process concerning Walker's and Wascher's transfers.

Moreover, once they were transferred, Walker and Wascher were not allowed to return, despite the fact that BAF was almost immediately in need of security investigators due to the November 5, 2013 raid. The evidence reflects that Cleary "pleaded" with Vectrus to bring in experienced personnel, and when he asked about bringing Walker and Wascher back to BAF, he was told "they were needed where they're at." Cleary responded, "I was like, 'we're the biggest base with the most traffic. We need personnel here.'" In fact, Maker recalls that Cleary stated his belief

to both Maker and Diaz that Wascher would be a good replacement for Daniel, who had been debarred; Diaz responded, "that's a company decision and we will go through our hiring process and make a decision on the appropriate person."

The denials to return to BAF continued during the months Walker and Wascher worked at the FOBs. Kelly Harris testified that in the spring 2014 he and Walker were present at a meeting at FOB Shank at which Askew presided. Askew reported to the entire screening cell that Vectrus was "downsizing" and it "needed investigators at [BAF] and sought volunteers to transfer from Shank to BAF." According to Harris, Walker was the only investigator who raised his hand and verbally volunteered to transfer to BAF, but Askew did not respond. After the meeting, Askew approached Harris in his office and asked him whether he would agree to transfer to BAF; Harris declined and encouraged Askew to speak to Walker since Harris knew Walker wanted to transfer.

Similarly, in May 2014, Michael Zink, Vectrus senior supervisor, attended a meeting with Askew, who was then Vectrus' regional manager. Vectrus was reducing positions at FOB Marmol and considering which employees should be transferred to other locations, including BAF. Zink believed that Wascher was a "strong" investigator, so suggested to Askew that he "would like to see [Wascher] among those transferred back to Bagram." Askew refused saying that "Wascher and Jamie Lytle had tried to take the company down," Askew "did not trust Wascher who he referred to as a 'snake in the grass,'" and "if [Zink] had the information that Askew knew from his prior position in Employee Relations, [Zink] would not trust Wascher and would not want him at Bagram."

Importantly, Glover, who had arrived at BAF in August 2013, testified that "everything was closing down, so the best place to be was Bagram, if you wanted to, you know, work out your contract."

The Court finds this evidence sufficient to raise genuine issues of material fact as to whether Walker's and Wascher's late October 2013 transfers to FOBs Shank and Marmol, which eventually led to their terminations during reductions in force, were imposed in retaliation for Walker's and Wascher's cooperation in the military's investigation of security violations at Vectrus. The evidence raises material issues as to whether Vectrus management considered Walker and Wascher "troublemakers" whom they denied returns to a facility that was not (at least, at the time) in danger of closing. *See Barlow*, 703 F.3d at 508 (quoting *Lorenz*, 823 P.2d at 109) ("Colorado law requires that an employer 'was aware, or reasonably should have been aware' that the employee's actions were legally protected." ).

C.     Constructive Discharge

Vectrus argues that it did not actually terminate Walker and Wascher, but offered them "demotions" in lieu of termination. Plaintiffs counter that such offers constituted constructive discharges under the law.

Whether a constructive discharge has occurred is a question of fact to be resolved by a jury. *Arnold v. McClain*, 926 F.2d 963, 966 (10th Cir. 1991); *Strickland v. UPS*, 555 F.3d 1224, 1228 (10th Cir. 2009). "When, however, the record does not give rise to a reasonable inference that a constructive discharge has occurred, the question is appropriately resolved by a judge as a matter of law." *Heutzenroeder v. Mesa Cnty. Valley Sch. Dist. 51*, 391 F. App'x 688, 693 (10th Cir. 2010) (citing *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1222 (10th Cir. 2002)).

"The determination of whether the actions of an employer amount to a constructive discharge depends upon whether a reasonable person under the same or similar circumstances would view the new working conditions as intolerable, and not upon the subjective view of the individual employee." *Boulder Valley Sch. Dist. R-2 v. Price*, 805 P.2d 1085, 1088 (Colo. 1991) (en banc),

*overruled in part on other grounds by Community Hosp. v. Fail*, 969 P.2d 667 (Colo. 1998), (quoting *Wilson v. Bd. of Cnty. Comm'ns*, 703 P.2d 1257, 1259, 1260 (Colo. 1985) and citing *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982)). "To prove a constructive discharge, a plaintiff must present sufficient evidence establishing deliberate action on the part of an employer which makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign." *Id.* (quoting *Wilson*, 703 P.2d at 1259)[5]; *see also Krauss v. Catholic Health Initiatives Mountain Region*, 66 P.3d 195, 202-03 (Colo. App. 2003).

Plaintiffs are correct that even a "perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify [a] finding of constructive discharge." *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 993 (10th Cir. 1994) (citing *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177-78 (10th Cir. 1986)); *see also Christie v. San Miguel Cnty. Sch. Dist. R-2(J)*, 759 P.2d 779, 783 (Colo. App. 1988) (plaintiff's alleged "demotion" was simply a reassignment of duties and, thus, was insufficient to demonstrate a constructive discharge).

Here, the Court concludes that the question of whether Walker and Wascher suffered constructive discharges should be submitted to a jury. Kelly Harris, security investigator, testified that FOB Shank was "among the most dangerous [FOBs] in Afghanistan. [It] was attacked by direct and indirect fire nearly every day, often more than once per day. These attacks often resulted in casualties. A number of employees quit their jobs rather than be stationed at Shank." Walker testified that he was fearful of working at Shank, but stayed on because he was receiving a six-figure

---

[5]*Boulder Valley* cites the following example: "In *Civil Rights Commission v. Colorado*, 30 Colo. App. 10, 488 P.2d 83 (1971), the court found a constructive discharge, but no discriminatory purpose, where a teacher signed a letter of resignation based on her superior's refusal to recommend her for rehiring. There was no duress or coercion to have the teacher sign the letter of resignation, but there was evidence that the teacher would not have resigned had she been able to receive a favorable recommendation."

salary as a security investigator. Wascher testified that he was very upset when he was characterized as a "dissatisfactory" employee during the reduction in force at Marmol. Moreover, a jury could find that the offers of the demotions, rather than permitting Walker and Wascher to return to BAF when positions were open, would compel a reasonable person to resign.

In sum, the Court finds that Walker and Wascher have raised genuine issues of material fact as to whether their transfers and eventual terminations of employment were actions taken by Vectrus in retaliation for Walker and Wascher's reports to the military concerning security violations at BAF.

## II. Defense Contractor Whistleblower Protection Act (10 U.S.C. § 2409) Claim

The Court notes first that, as stated in its order on Defendant's motion for summary judgment regarding Plaintiffs' second claims for relief, the Court will decline to apply Vectrus' suggested legal standard for adjudicating Walker's § 2409 claim.

Citing unpublished cases from the Northern District of Alabama and the Eastern District of Virginia, Vectrus urges that "[t]he *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework should be used to evaluate claims under the Act." Mot. 17 (citing *DeVillo v. Vision Centric, Inc.*, No. 5:15-cv-02211, 2017 WL 3425465, at *3 (N.D. Ala. Aug. 9, 2017) and *Brach v. Conflict Kinetics Corp.*, No. 1:16-cv-978, 2017 WL 3267961, at *14 (E.D. Va. Jul. 31, 2017). However, neither of these opinions recognize that § 2409 incorporates into the statute a framework for burdens of proof to determine whether retaliation has occurred.[6] That is, § 2409(c)(6) provides that the legal burdens in 5 U.S.C. § 1221(e) shall be controlling for any judicial determination of whether retaliation occurred. Section 1221(e), in turn, requires that an employee show his protected activity was a "contributing factor" in the adverse employment action taken,

---

[6]In *Brach*, the court cites to 5 U.S.C. § 1221(e)(1)(B)(2), but fails to apply the burden articulated therein. 2017 WL 3267961 at *17–*18.

unless the contractor "demonstrates by clear and convincing evidence that it would have taken the same personnel action" notwithstanding the protected activity. 5 U.S.C. § 1221(e)

Thus, Walker will succeed on his claim for retaliation in violation of 10 U.S.C. § 2409 if he demonstrates (1) he engaged in protected activity as described in the statute, (2) the Vectrus decision maker knew he engaged in protected activity, and (3) his protected activity was a contributing factor in the adverse employment action taken against him, unless (4) Vectrus shows by clear and convincing evidence that it would have taken the employment action despite Walker's protected activity. *See United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610 (E.D. Va. 2016).[7]

The Court has already determined that § 2409 did not apply to the subcontract under which the Plaintiffs worked until June 17, 2014, which was after the termination dates of Cross, Lytle, Cejka, and Wascher. The only adverse employment action about which Walker complains that took place after June 17, 2014 was his termination of employment. Thus, the questions before the Court are (1) did Walker engage in protected activity under § 2409?; and (2) has Walker raised genuine

---

[7] The *Cody* court determined:

> . . . under the DCWPA, a whistleblower employee is entitled to relief for retaliation if he or she demonstrates that a protected activity was a "contributing factor" in the "personnel action which was taken" and that "the official taking the personnel action knew of the ... protected activity." 5 U.S.C. § 1221 (e)(1). The employee may demonstrate such a causal connection through circumstantial evidence such as temporal proximity, but the employee is not entitled to relief if the employer "demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 122l(e)(1)(B), (2). Based on these statutes, in order to establish a prima facie case of unlawful retaliation, a whistleblower plaintiff must establish that: (1) he engaged in "protected activity"; (2) his employer knew or was reasonably on notice that he was engaged in protected activity; and (3) his employer took adverse action against him as a result of his protected activity. *See Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013); *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999).

207 F. Supp. 3d. at 620-21.

issues of material fact as to whether his reports to the military were a contributing factor in his termination, or has Vectrus shown by clear and convincing evidence that it would have terminated Walker despite his protected activity?

A.    Protected Activity

According to § 2409(a), an employee enjoys protection if he discloses to certain government officials, judicial officers or grand jurors, or managers or other employees of the employer who have the responsibility to investigate, discover or address misconduct, what he reasonably believes is evidence of gross mismanagement of a DOD contract, gross waste of DOD funds, an abuse of authority relating to a DOD contract, or a violation of law, rule, or regulation relating to a DOD contract.  10 U.S.C. § 2409(a)(1) & (2).

Here, the parties dispute whether any protected activity may occur before, or must occur after, the effective date of the DCWPA.  The parties have not cited nor has the Court found any case law directly addressing this issue.  However, courts that have addressed an analogous issue involving other anti-retaliation statutes have considered protected activity that occurred outside the statute of limitations period.  *See, e.g., Quidachay v. Kan. Dep't of Corrs.*, 239 F. Supp. 3d 1291, 1295 (D. Kan. 2017) (finding allegations of protected activity and adverse actions for a Rehabilitation Act claim occurring outside the statute of limitations were relevant to establish a causal link and sufficient to "plausibly suggest" retaliation); *Meiners v. Univ. of Kan.*, 239 F. Supp. 2d 1175, 1189, 1190–91 (D. Kan. 2002) (finding that the administrative statute of limitations in a Title VII case began to run on the date of the adverse action and, thus, the protected activity that occurred before such date was considered in determining whether defendant was entitled to summary judgment); *Kelley v. City of Albuquerque*, 375 F. Supp. 2d 1183, 1221 (D. N.M. 2004) (same); *Nguyen v. United Gov't of Wyandotte Cnty.*, No. 16-2654-JAR, 2017 WL 2080622, at *4

(D. Kan. May 15, 2017) (declining to strike factual allegations concerning the plaintiff's protected activity of filing an internal complaint in 2013, which served as the basis of his Title VII and 42 U.S.C. § 1981 retaliation claims).

The Court agrees with the proposition that the date on which to determine whether an anti-retaliation statute applies is the date the plaintiff allegedly suffered retaliation. Thus, the fact that protected activity may fall outside the statute's limitations period is immaterial; the question is whether the protected activity contributed to causing the retaliatory action. In this case, the evidence reveals Walker engaged in the protected activity of reporting BAT system access and security violations to military oversight and to, at least, the U.S. Army counter-intelligence unit ("CI") and the criminal investigation command ("CID"), and the Judge Advocate General's Office ("JAG").

B.     Causal Connection

The Court concludes that, as with Walker's wrongful discharge claim, a jury will need to determine whether Walker's reports to the military contributed to his transfer, the alleged denials of his return to BAF, and his eventual termination, or whether Vectrus would have terminated Walker in spite of his reports. With respect to whether the reports contributed to the eventual termination, the Court finds persuasive the Fourth Circuit's opinion cited in *Cody*, 207 F. Supp. 3d at 624:

> A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision. This element is broad and forgiving, and this test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action. Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation, the causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event.

*Id.* (quoting *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)).

"Under this 'broad and forgiving' standard, a plaintiff has 'a rather light burden of showing by a preponderance of the evidence that the [protected] activities tended to affect his termination in at least some way.'" In this case, Walker has met his "light burden" of demonstrating a material factual issue as to whether his termination of employment with Vectrus was retaliatory in violation of 10 U.S.C. § 2409.

## III.    Outrageous Conduct Claims

The Court has previously ordered that Walker and Wascher failed to state claims for intentional infliction of emotional distress—or, "outrageous conduct"—except as to their "transfers to dangerous FOBs."  Vectrus argues that Plaintiffs fail to demonstrate genuine issues of material fact as to whether Vectrus' decision to transfer Walker and Wascher constituted outrageous conduct.

To prove outrageous conduct under Colorado law, a plaintiff must demonstrate: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct.  *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (en banc).  Vectrus' actions must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753, 756 (1970)).  "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and calculously inflicted."  *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo.

1994).  Although "the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*, 877 P.2d at 883).

In this case, the Court finds that a reasonable person could come to no conclusion other than that Vectrus' decision to transfer Walker and Wascher—while possibly intended to compel them to resign—was not intended to inflict severe emotional distress on the Plaintiffs.  First, there is nothing in the evidence demonstrating that FOB Marmol was any more dangerous than BAF; in fact, Wascher testified that, other than less "permanent" building facilities (i.e., tents vs. huts), Marmol was not much different than BAF for him in terms of security.  Wascher Dep. 77: 20 – 81: 5.

As for FOB Shank, Kelly Harris testified that it was "among the most dangerous [FOBs] in Afghanistan. [It] was attacked by direct and indirect fire nearly every day, often more than once per day."  While this may be true, and while Walker testified that he lived in fear of the attacks while assigned there, he did not immediately "quit" his job "rather than be stationed at Shank," as Harris testified many employees did.  Moreover, and more importantly, the evidence lacks any indication that the decision to transfer Walker to Shank was reckless or motivated by an intent to harm Walker emotionally, particularly as Vectrus transferred Tom Robin to Shank at the same time Walker was transferred there.  Certainly, the Plaintiffs have proffered no evidence nor argument that Robin also participated in reports to the military or, otherwise, engaged in conduct that would lead Vectrus to transfer Robin to Shank in an effort to inflict on him severe emotional distress.

## CONCLUSION

The Court finds material factual issues exist concerning whether Vectrus retaliated against Walker and Wascher by transferring them to FOBs, denying them returns to BAF, then terminating

their employment after they reported potential security violations. However, the Plaintiffs failed to demonstrate material factual issues regarding whether Vectrus inflicted on them severe emotional distress by transferring Walker and Wascher to allegedly "dangerous" FOBs.

THEREFORE, Defendant Vectrus Systems Corporation's Motion for Summary Judgment as to Plaintiff Steven Wascher's and James Walker's First and Third Claims for Relief [filed October 2, 2017; ECF No. 120] is **granted in part and denied in part**. Walker's and Wascher's third claims for relief are dismissed with prejudice.

Dated at Denver, Colorado, this 14th day of February, 2018.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge